**TABLE OF CONTENTS**

**STATEMENT OF IDENTITY AND INTERESTS IN THE CASE** ........................................ 4

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS** ......................... 5

**SUMMARY OF ARGUMENT** ................................................................................. 5

**ARGUMENT** ........................................................................................................ 6

   I.   L.D. 748 ADDRESSES THE PROBLEM OF ECONOMIC ABUSE AND COERCED DEBT ................ 6

      A.  *Laying the Landscape: Costs of Domestic and Sexual Violence, Poverty, and the Prevalence of Economic Abuse* ................................................................................. 6

      B.  *Coerced Debt and Credit Damage is a Method of Economic Abuse* ............................. 11

      C.  *The Reporting of Debt Resulting from Economic Abuse "Ripples" Throughout a Survivor's Lifetime and Impacts the Ability of a Survivor to Obtain Much Needed Credit, Employment, or Housing* ................................................................................. 12

   II.  L.D. 748 SUPPLEMENTS THE PROCESS FOR SURVIVORS OF ECONOMIC ABUSE TO ADDRESS CREDIT DAMAGE ............................................................................................. 14

**CONCLUSION** .................................................................................................... 16

# **TABLE OF AUTHORITIES**

### CASES

*Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) -----------14

*Massachusetts Ass'n of Health Maint. Organizations v. Ruthardt*, 194 F.3d 176, 179 (1st Cir. 1999) ----------------------------------------------------------------------------------------------------------14

Ruthardt, 194 F.3d 176, 179 (1st Cir. 1999)----------------------------------------------------------------14

### STATUTES

15 U.S.C. § 1681(a)(1) ---------------------------------------------------------------------------------------14
15 U.S.C. § 1681c ---------------------------------------------------------------------------------------------15
15 U.S.C. § 1681t(b) ------------------------------------------------------------------------------------------15
15 U.S.C. § 1681t(b)(1)(E)-----------------------------------------------------------------------------------15
L.D. 748 ----------------------------------------------------------------------------------------------- passim
TX Penal Code §32.51(b) -----------------------------------------------------------------------------------11

### OTHER AUTHORITIES

Adrienne Adams et al., Development of the scale of economic abuse, 14 Violence Against Women 563, 563-88 (2008)-------------------------------------------------------------- 7-10, 12, 13

Adrienne Adams, et al., Evidence of the Construct Validity of the Scale of Economic Abuse, 30(3) Violence Vict. (2015)------------------------------------------------------------------------- 7, 9

Adrienne Adams, The Frequency, Nature, and Effects of Coerced Debt Among a National Sample of Women Seeking Help for Intimate Partner Violence, Violence Against Women 22:1077801219841445 (2019)----------------------------------------------------------------- 7,11

Angela Littwin, Coerced Debt: The Role of Consumer Credit in Domestic Violence, 100 Calif. Law Rev. 1 (2012)----------------------------------------------------------------------------------7, 9, 10

Center for Survivor Agency and Justice, Federal Comments to the Consumer Financial Protection Bureau On Proposed Rulemaking On Payday, Vehicle Title, And Certain High-Cost Installment Loans, (2019). ------------------------------------------------------------------13

Charlene Baker, et al., Domestic Violence and Housing Problems: A Contextual Analysis of Women's Help-Seeking, Received Informal Support, and Formal System Response, 9(7) Violence Against Women, 754–83 (2003)--------------------------------------------------------12

Erika Sussman and Sara Wee, Accounting For Survivors' Economic Security: An Atlas For Direct Service Providers (2016). ---------------------------------------------------------------- 9

Evan Stark, Coercive control: How Men Entrap Women in Personal Life, Oxford University Press (2007).-------------------------------------------------------------------------------------------- 6

Jill Davies, Safety Planning, Greater Hartford Legal Aid (2009) -------------------------------------- 8

Joanne Pavao, et al, Intimate Partner Violence and Housing Instability, 32(2) Am. J. Prev. Med. 143-46 (2007) -----------------------------------------------------------------------------------------12

Judy Postmus, et al. Measuring Economic Abuse in the Lives of Survivors: Revising the Scale of Economic Abuse, 22(6) Violence Against Wom. (2015) -------------------------------------------- 7,9

K. Siefert et al., Food Insufficiency and Physical and Mental Health in a Longitudinal Survey of Welfare Recipients, 45(2) J. Health Soc Behav., 171-86 (2004). ---------------------------------- 13

Lisa Brush, Battering and the Poverty Trap, 8(3) Journal of Poverty, 23-43 (2004) --------------- 13

Lisa Goodman, When Crises Collide, 10(4) Trauma Violence & Abuse 306-29 (2008); Stephanie Riger, et. al, The Impact of Intimate Partner Violence on Women's Labor Force Participation, Department of Justice (2004). ------------------------------------------------------------------------ 8

Ryan Matlow, et. al. The Impact of Appraisals and Context on Readiness to Leave a Relationship Following Intimate Partner Abuse, 21 Violence Against Women (2015) ------------------------- 7

Sara J. Shoener, The Price of Safety: Hidden Costs and Unintended Consequences for Women in the Domestic Violence Service System (2016) -------------------------------------------------- 7, 8

Sara Shoener and Erika Sussman, Economic Ripple Effect of IPV: Building Partnerships for Systemic Change, 83 (2013) ------------------------------------------------------------------------- 6, 12

Shannan Catalano, Intimate Partner Violence: Attributes of Victimization, 1993–2011, Department of Justice, Bureau of Justice Statistics (2013). -------------------------------------- 5

**UNITED DISTRICT COURT
DISTRICT OF MAINE**

CONSUMER DATA INDUSTRY
ASSOCIATION,

    Plaintiff,

    v.

AARON FREY IN HIS CAPACITY              **Case No. 1:19-cv-00438-GZS**
AS ATTORNEY GENERAL OF THE
STATE OF MAINE,

And

WILLIAM M. LUND IN HIS
CAPACITY AS SUPERINTENDENT
OF THE MAINE BUREAU OF
CONSUMER CREDIT PROTECTION

    Defendants.

**STATEMENT OF IDENTITY AND INTERESTS IN THE CASE**

Amicus curiae, The Center for Survivor Agency and Justice ("CSAJ"), is a national organization that addresses the critical link between domestic and sexual violence and economic security. For over thirteen years, CSAJ has been a leader at the intersection of interpersonal violence and economic security by providing national in-person and webinar trainings, technical assistance, organizational assessment, and advocacy through multiple projects. CSAJ's Consumer Rights for Domestic and Sexual Violence Survivors Initiative enhances economic justice for survivors by building the capacity of and building partnerships between the anti-violence and consumer rights fields. Our Racial and Economic Equity for Survivors Project addresses the systemic economic barriers facing survivors of color, including Latinx, immigrants, and survivors who are marginalized by their intersecting identities. The Access to

Justice for Survivors Project fills gaps in low-income survivors' ability to access systems by working with non-lawyer legal advocates to address the costs of domestic violence and sexual assault and remove the systemic economic barriers and inequities that impede survivors' access to economic justice and physical safety. In 2017, CSAJ also published a Guidebook on Economic and Consumer Advocacy for Domestic and Sexual Violence Survivors. The Guidebook has been accessed online over 2400 times and downloaded over 850 times by attorneys and advocates around the country, including by those based in Maine.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

Amicus curiae states that this brief was not authored in whole or in part by any party or its counsel, and that no person other than amici, its members, or its counsel contributed any money that was intended to fund the preparation and submission of this brief.

## SUMMARY OF ARGUMENT

Economic abuse and coerced debt are widespread problems for survivors of domestic and sexual violence. Nationally, there is a lack of legal remedies to address the problem of credit damage caused by the economic abuse of an intimate partner. Maine created a vital remedy with L.D. 748. The Consumer Data Industry Association's ("CDIA") filed its complaint alleging that (1) two recent acts passed by the Maine legislature, L.D. 110 and L.D. 748, are preempted by the Fair Credit Reporting Act and (2) "the imminent enforcement of L.D. 110 and L.D. 748 will undermine the accuracy, integrity, and reliability of consumer report information that is essential to the 'needs of commerce and the 'efficiency of the banking system' throughout the United States."

Amicus Curiae, a national leader at the intersection of interpersonal violence and economic security, seeks to address these issues in its brief, specifically relating to L.D. 748. Contrary to the CDIA's assertion, compliance with L.D. 748 will not undermine the accuracy,

integrity, and reliability of consumer report information. Indeed, the requirements of L.D. 748 will actually improve credit scores and accuracy by removing inaccurate information stemming from abuse and identity theft of survivors. No longer reporting these debts will set survivors up for economic security and more accurately depict their credit worthiness. Additionally, L.D. 748 is not preempted by the federal Fair Credit Reporting Act ("FCRA") but rather supplements and streamlines procedures that are already available to survivors of economic abuse.

## ARGUMENT

### I. L.D. 748 Addresses the Problem of Economic Abuse and Coerced Debt

#### A. Laying the Landscape: Costs of Domestic and Sexual Violence, Poverty, and the Prevalence of Economic Abuse

Each year in the U.S., approximately 800,000 women are physically assaulted by an intimate partner. Shannan Catalano, Intimate Partner Violence: Attributes of Victimization, 1993–2011, Department of Justice, Bureau of Justice Statistics (2013). For many survivors, physical violence is only one component of their victimization. Abusers exert their power through a wide range of physical, sexual, psychological, and economic abuse tactics, which over time limit survivors' autonomy and freedom to make life choices. Evan Stark, Coercive control: How Men Entrap Women in Personal Life, Oxford University Press (2007). Despite operating in a restrictive environment under perpetual threat of harm, women[1] in abusive relationships are not passive victims, but instead continually seek safety. Belle Liang, et. al, A Theoretical Framework For Understanding Help-Seeking Processes Among Survivors Of Intimate Partner Violence, 36 Am. J. of Community Psych., 71 (2005). Their efforts, however, are often impeded by a lack of financial resources.

---

[1] The available data suggest that, while IPV have some gender-neutral aspects, dimensions associated with power and control implicates gender (Johnson, 2006). The more control-oriented it is, the more likely it is to be perpetuated by men against women (Black, 2010). It is for this reason that the current study focuses on women and uses gendered language in referencing victims.

### i. Survivors Remain in Abusive Relationships Because They Cannot Afford to Leave

The abuse (hereinafter referred to as domestic violence ("DV") and sexual assault ("SA")) financially devastate survivors, resulting in an "economic ripple effect" across their lifespan. Sara Shoener and Erika Sussman, Economic Ripple Effect of IPV: Building Partnerships for Systemic Change, 83 (2013). Abusers create economic instability for their partners through economic sabotage and control. The resulting or pre-existing poverty experienced by survivors, in turn, creates increased vulnerability to violence and additional barriers to safety. Financial stability and access to resources can be the difference between staying or leaving an abusive relationship.

A recent study with a national sample of 1823 DV/SA survivors showed that 73% remained in abusive relationships longer than they wanted because of concerns about financially supporting themselves and their children (Adrienne Adams, The Frequency, Nature, and Effects of Coerced Debt Among a National Sample of Women Seeking Help for Intimate Partner Violence, Violence Against Women 22:1077801219841445 (2019)).

For decades, research has shown that women remain in or return to abusive relationships because they lack the financial resources to live independently of the perpetrator. Id.; Ryan Matlow, et. al. The Impact of Appraisals and Context on Readiness to Leave a Relationship Following Intimate Partner Abuse, 21 Violence Against Women (2015). Abusers foster victims' economic dependence by interfering with employment, restricting access to or stealing money, hiding financial information, and generating debt in their partner's name, among other strategies. See Adrienne Adams et al., Development of the scale of economic abuse, 14 Violence Against Women 563, 563-88 (2008); Angela Littwin, Coerced Debt: The Role of Consumer Credit in Domestic Violence, 100 Calif. Law Rev. 1 (2012). The consequences for victims include less

7

money to meet basic needs, greater material hardship, and reduced financial self-sufficiency. Adrienne Adams, et al., Evidence of the Construct Validity of the Scale of Economic Abuse, 30(3) Violence Vict. (2015); Judy Postmus, et al. Measuring Economic Abuse in the Lives of Survivors: Revising the Scale of Economic Abuse, 22(6) Violence Against Wom. (2015). Further, recent qualitative research has shown that the very efforts victims make to seek safety through engagement with service systems often result in financial costs that compromise their financial well-being. Sara Shoener, The Price Of Safety: Hidden Costs And Unintended Consequences For Women In The Domestic Violence Service System, (2017). For example, victims may incur transportation and childcare expenses and forfeit wages when they go to go to court for a protection order or consult with an attorney on a divorce or custody case; or they may lose a job or place to live when they go to shelter. For women with limited personal financial resources, the economic effects of IPV and safety seeking restrict options and heighten risk for further victimization. See Lisa Goodman, When Crises Collide, 10(4) Trauma Violence & Abuse 306-29 (2008); Stephanie Riger, et. al, The Impact of Intimate Partner Violence on Women's Labor Force Participation, Department of Justice (2004).

      ii.   The Costs of Domestic and Sexual Violence

Survivors of DV/SA experience profound economic costs, which impede their access to safety. Batterer-generated costs result from (1) physical abuse (e.g., property damage, medical bills, eviction, loss of employment) (Jill Davies, Safety Planning, Greater Hartford Legal Aid (2009)), (2) economic abuse (99% of survivors report experiencing economic control or exploitation) (Adrienne Adams et al., Development of the scale of economic abuse, 14 Violence Against Women 563, 563-88 (2008)), (3) batterers initiating survivors' involvement in systems (e.g. dual arrest, wrongful accusation or coercion into criminal activity, false reports to child welfare or public benefits) (Sara J. Shoener, The Price of Safety: Hidden Costs and Unintended

Consequences for Women in the Domestic Violence Service System (2016)), as well as (4) costs incurred by navigating the safety system. As a result, 76% of survivors indicate that abusers are largely responsible for their economic hardship. Life-generated costs include things such as housing, food, utilities, transportation, health care, and childcare. For survivors living in poverty, the cost of meeting one's basic needs far exceeds one's means. Without a safety net or family assets from which to draw, indigent survivors cannot pay their bills, and therefore face substantial debt.

The economic impact of DV/SA is particularly acute for survivors who are members of communities that have historically experienced structural discrimination. Those marginalized by race, sexual orientation, gender identity, physical and cognitive ability, citizenship status, age, and ethnicity experience both domestic and sexual violence and poverty at much higher rates. Erika Sussman and Sara Wee, Accounting For Survivors' Economic Security: An Atlas For Direct Service Providers (2016).

Abusers commonly use economic abuse – e.g. tactics of financial control and exploitation -- to gain and maintain power over their partners. In fact, research shows that 94-99% of service-seeking survivors report that their partner used economic abuse tactics, many of which generate costs for the victim. A. E. Adams et al., Development of the scale of economic abuse, 14 VIOLENCE AGAINST WOMEN 563 (2008); Adrienne Adams, et al., Evidence of the Construct Validity of the Scale of Economic Abuse, 30(3) Violence Vict. (2015); J.L. Postmus et al., Understanding economic abuse in the lives of survivors, 27 J. OF INTERPERSONAL VIOLENCE 411 (2011). In addition, 76% of survivors indicated that abusers were largely responsible for their economic hardship because of strategies such as stealing money and assets, building debt, and sabotaging employment. A. E. Adams et al., Development of the scale of economic abuse, 14

9

VIOLENCE AGAINST WOMEN 563 (2008). For instance, survivors report being evicted from their residence because of their partners' actions; losing wages because their partner prevented them from going to work; losing personal possessions that their partner destroyed; quitting school because of the abuser's interference; missing bill payments because their partner kept them from having the necessary funds; having debt that their partner put in their name through coercive or fraudulent transactions; and having retirement or other savings taken from them (A. E. Adams et al., Development of the scale of economic abuse, 14 VIOLENCE AGAINST WOMEN 563 (2008); Angela Littwin, Coerced Debt: The Role of Consumer Credit in Domestic Violence, 100 Calif. Law Rev. 1 (2012)).

The legal system is a critical entry point for survivors in their efforts to secure physical safety and economic security. As will be discussed more in depth in the next section, survivors seek assistance for identity theft and coerced debt and face challenges in navigating those debt collection systems. The vast majority of DV/SA survivors face multiple and compounding disadvantages in accessing justice: survivors incur profound costs resulting from the abuse they have experienced, while courts and other social service systems are costly to navigate, often prohibitively so. To access long-term safety, survivors must navigate multiple and diverse legal systems, pursuing and defending court cases, which include protection orders, housing, employment, public benefits, child custody, immigration, education, and an array of consumer issues including debt collection. Legal avenues to address coerced debt are few and far between.[2]

---

[2] For years CSAJ has provided TA to a legal services program in Texas, inspiring them to establish a comprehensive program on consumer advocacy for survivors (CSAJ featured Texas Rio Grande Legal Aid as a Spotlight on Innovative Consumer Justice: https://mailchi.mp/303c3a8e4db5/putting-the-spotlight-on-texas-rio-grande-legal-aid). They recently convened a Texas Coerced Debt Coalition to advance legal options for survivors facing coerced debt and changed the Texas criminal identity theft statute to be responsive to coerced debt. Since 2011, CSAJ has provided similar assistance to a DV & Consumer Law Clinic for survivors in New York City, which recently published a report on the link between debt and homelessness. CAMBA Legal Services, Inc., Fordham Law School Feerick Center for Social Justice & The Legal Aid Society. Denied: How Economic Abuse Perpetuates Homelessness for Domestic Violence Survivors, 2018.

### B. Coerced Debt and Credit Damage is a Method of Economic Abuse

To break the link between poverty and violence, attorneys and advocates must understand and address the consumer issue of ***coerced debt***. Coerced debt is defined as "non-consensual, credit-related transactions that occur in an intimate relationship where one partner uses coercive control to dominate the other partner," presents enormous long-term economic consequences for survivors. Angela Littwin, Coerced Debt: The Role of Consumer Credit in Domestic Violence, 100 Cal. L. Rev. 951 (2012).

In their groundbreaking study on economic abuse, Adrienne Adams and colleagues found that nearly all survivors experience economic abuse, and 76% report their economic hardship was due to an abusive partner. A. E. Adams et al., Development of the scale of economic abuse, 14 VIOLENCE AGAINST WOMEN 563 (2008). More recent research shows 71% of survivors report their partners kept financial information from them, and over half (52%) put debt in their name through fraud or coercion (e.g. taking out credit in their name, forcing them to sign deeds). Adrienne Adams, The Frequency, Nature, and Effects of Coerced Debt Among a National Sample of Women Seeking Help for Intimate Partner Violence, Violence Against Women 22:1077801219841445 (2019). Those who experienced coerced debt were nearly 3 times as likely to stay with their partners due to financial hardship. *Id.* Apart from the immediate effects of "coerced debt," it damages a survivor's credit and has collateral consequences on their access to employment, housing, utilities, and long-term economic security.[3] Professor Litwin aptly notes that coerced debt "makes the consumer credit system an unknowing party to domestic violence." *Id.*

---

[3] The statistics specific to Maine can be found in *A Report on the Impact of Economic Abuse on Survivors of Domestic Violence in Maine*, Presented to the Joint Standing Committee on Judiciary, February 7, 2019, p.14 (Document 13-4, Exhibit D, p. 58).

11

By passing L.D. 748, Maine is at the forefront of addressing coerced debt and clearing the resulting inaccuracies from survivors' credit reports. No specific laws yet exist to target coerced debt, except for L.D. 748 and TX Penal Code §32.51(b), which expands identity theft liability in instances of coercion. Other states, advocates, and attorneys are strategizing about how to provide relief to coerced debt survivors. L.D. 748 defines economic abuse to assist CRA's and survivors in knowing what kind of documentation will be useful in disputing the existence of inaccurate debts.  L.D. 748 is directly responsive to the well-substantiated needs of survivors who experience coerced debt.  Since 2012, CSAJ has worked with attorneys, advocates, and survivors across the nation to better understand and address the pervasive issue of coerced debt.  In fact, almost half of the requests from lawyers and advocates have focused upon addressing coerced and other forms of debt defense.  In 2016, CSAJ hosted a groundbreaking two-part webinar series on Coerced Debt, Debt Defense, and Safety for Survivors, which yielded unprecedented registration – over 300 registrants participated in each of the trainings.  Given the pervasiveness of the issue and the challenges it presents to advocates for survivors, CRA's need L.D. 748 to properly execute the requirements of the FCRA.

### C. The Reporting of Debt Resulting from Economic Abuse "Ripples" Throughout a Survivor's Lifetime and Impacts the Ability of a Survivor to Obtain Much Needed Credit, Employment, or Housing

#### i. Impact on Credit Employment or Housing

Survivors of DV/SA experience profound economic harms that extend far beyond the short term. They often contend with issues such as debt, ruined credit, loss of housing and employment, and identity theft, all of which remain long after the abuse has ended in an *economic ripple effect*. Sara Shoener and Erika Sussman, Economic Ripple Effect of IPV: Building Partnerships for Systemic Change, 83 (2013). Creditors, potential employers, landlords, and more use consumer reports to offer applicants credit, jobs, homes, and other necessities.

12

Financial insecurity manifests as material hardship among DV/SA survivors. For instance, it is common for survivors to report difficulty finding and maintaining affordable housing. Survivors have been shown to be four times more likely to report housing instability than non-victims (Joanne Pavao, et al, <u>Intimate Partner Violence and Housing Instability</u>, 32(2) Am. J. Prev. Med. 143-46 (2007)), and several studies have documented survivors' experiences of eviction and home foreclosure, doubling-up in homes with friends or relatives, and homelessness. <u>See</u>, A. E. Adams et al., <u>Development of the scale of economic abuse</u>, 14 VIOLENCE AGAINST WOMEN 563 (2008); Charlene Baker, et al., <u>Domestic Violence and Housing Problems: A Contextual Analysis of Women's Help-Seeking, Received Informal Support, and Formal System Response,</u> 9(7) Violence Against Women, 754–83 (2003). Food insufficiency and utility insecurity have also been found to be common problems for DV/SA survivors (See, Adams, et al., 2008; Lisa Brush, <u>Battering and the Poverty Trap,</u> 8(3) Journal of Poverty, 23-43 (2004); K. Siefert et al., <u>Food Insufficiency and Physical and Mental Health in a Longitudinal Survey of Welfare Recipients,</u> 45(2) J. Health Soc Behav., 171-86 (2004). As with financial strain, DV/SA has been linked to this material hardship, with increased DV/SA predicting greater material hardship over time. Adams, et al. (2008). Indeed, one study indicated that survivors experienced significantly more material hardship than non-survivors and that the effects lasted for up to three years after the abuse ended. Adams, et al. (2012).

### ii. Economic abuse subjects a survivor to predatory lending and further debt traps

Survivors of domestic violence in need of quick access to money are attractive to predatory and discriminatory creditors looking to capitalize on individuals' desperate situations. Survivors are driven to these lenders for various reasons, all stemming from the interplay of economic abuse, debt, and credit reporting. As discussed above, abusers use economic abuse to

damage a survivor's credit. As a result, these survivors are often unable to obtain credit from traditional lenders. They often are only able to obtain credit on very unfavorable terms or are forced to seek alternative forms of credit. "[O]nce survivors fall prey the payday lending debt trap, payday lenders can take control over bank accounts, garnish wages, take away cars, and use harassment and threats to maintain control over the survivor. Indeed, this payday debt trap mirrors the coercive control and economic abuse perpetrated by the abusive partner the survivor worked so hard to escape." Center for Survivor Agency and Justice, Federal C*omments to the Consumer Financial Protection Bureau On Proposed Rulemaking On Payday, Vehicle Title, And Certain High-Cost Installment Loans*, (2019).

## II. **L.D. 748 Supplements the Process for Survivors of Economic Abuse to Address Credit Damage.**

The Supreme Court distinguishes between two types of preemption- express and implied. *Massachusetts Ass'n of Health Maint. Organizations v. Ruthardt*, 194 F.3d 176, 179 (1st Cir. 1999). The Court acknowledges that express preemption takes place "when Congress has 'unmistakably… ordained' that its enactments alone are to regulate a [subject, and] state laws regulating that [subject] must fall." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)). Implied preemption takes two different forms- "field" and "conflict" preemption. Field preemption is "inferred from the pervasiveness of federal regulation or dominance of federal interest in a particular area." Ruthardt*,* 194 F.3d 176, 179 (1st Cir. 1999). Conflict preemption takes place when "congressional intent can be deduced from circumstances such as inconsistency or impossibility." Id. "Preemption is strong medicine. Thus, although the power to preempt is absolute, its exercise is not lightly to be presumed."

Ruthardt, 194 F.3d 176, 178–79 (1st Cir. 1999) (citing Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)). "Rather, courts 'start with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' Id. (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). It follows inexorably that congressional intent stands at the base of all preemption analysis. Id. (citing Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)).

The CDIA fails to meet this court's standard for a determination of preemption. Firstly, the FCRA was passed in order to support fair and accurate credit reporting. "Inaccurate credit reports directly impair the efficiency of the banking system." 15 U.S.C. § 1681(a)(1). L.D. 748 supports that Congressional intent by removing information on survivors' credit reports caused by economic abuse. Such information is false and would not support accurate credit reporting.

Secondly, the CDIA argues that the FCRA expressly preempts L.D. 748 through its provisions in 15 U.S.C. § 1681c and 1681t(b). The FCRA explicitly disavows a broad application of federal preemption powers in 1681t(a). Congress clearly stated its intent in 1681(a) not to "annul, alter, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State" when gathering and distributing credit data.

Finally, the CDIA fails its substantial burden of showing express preemption. The CDIA characterizes 1681t(b)(1)(E) as preempting laws related to 1681(c), which 1681t(b)(1)(E) cursorily defines as "relating to information contained in consumer reports…". Id. The CDIA would have this court end its analysis here, without returning to the text of 1681(c). 15 U.S.C. § 1681(c) does not bar state regulation of *how* credit agencies report debt pertaining to economic abuse. Given that precedent disfavors a finding of federal preemption, that the FCRA allows for

supplemental state legislation in 15 U.S.C. § 1681t(a), and L.D. 748 is not barred by 15 U.S.C. § 1681(c), this Court should dismiss the CDIA's claim of preemption. L.D. 748 supplements the process by which survivors of economic abuse can obtain relief from credit damage. L.D. 748 defines economic abuse to assist CRA's and survivors in knowing what kind of documentation will be useful in disputing the existence of inaccurate debts. Given the pervasiveness of economic abuse and the challenges it presents to advocates for survivors, CRA's need L.D. 748 to properly execute the requirements of the FCRA.

## CONCLUSION

Compliance with L.D. 748 will not undermine the accuracy, integrity, and reliability of consumer report information. To the contrary, the requirements of L.D. 748 will improve credit scores and accuracy. Instead of contradicting federal law, as the CDIA argues, L.D. 748 supplement already existing provisions of federal law.

DATED: April 24, 2020					Respectfully Submitted,


					/S/ James M. Amendolara, Esq.
					State Bar Number 7271
					Counsel for Amicus Curiae
					Center for Survivor Agency and Justice
					Caring Unlimited, Inc.
					P.O. Box 590
					Sanford, Maine 04073
					(207) 490-3227 Ext. 125

## CERTIFICATE OF SERVICE

      I hereby certify that on this 24th day of April, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to the following:

      RYAN P. DUMAIS
      rdumais@eatonpeabody.com

      REBECCA E. KUEHN
      rkuehn@hudco.com

      CHRISTOPHER C. TAUB
      Christopher.C.Taub@maine.gov

      /S/ James M. Amendolara, Esq.
      Bar Number 7271
      Counsel for Amicus Curiae
      Center for Survivor Agency and Justice
      Caring Unlimited, Inc.
      P.O. Box 590
      Sanford, Maine 04073
      (207) 490-3227 Ext. 125