## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| CONSUMER DATA INDUSTRY ASSOCIATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Docket no. 1:19-cv-00438-GZS ) |
| AARON M. FREY & WILLIAM N. LUND, | ) ) ) ) |
| Defendants. | ) |

## ORDER ON PENDING MOTIONS

Before the Court are two motions: Plaintiff's Motion for Judgment (ECF No. 15) and Defendants' Motion for Judgment on a Stipulated Record (ECF No.16). Via these cross-motions, the parties ask the Court to resolve this matter in which Plaintiff, Consumer Data Industry Association ("CDIA"), seeks a declaratory judgment against Maine's Attorney General, Aaron M. Frey, and the Superintendent of Maine's Bureau of Consumer Credit Protection, William N. Lund (together, the "State Defendants"). As explained herein, the Court GRANTS Plaintiff's Motion (ECF No. 15) and DENIES the State Defendants' Motion (ECF No. 16).

### I. LEGAL STANDARD

When facing cross-motions for judgment on a stipulated record, the Court, in addition to resolving any legal disputes, "may 'decide any significant issues of material fact that [it] discovers' in the stipulated record." Thompson v. Cloud, 764 F.3d 82, 90 (1st Cir. 2014) (quoting Boston Five Cents Sav. Bank v. Secretary of Dep't of HUD, 768 F.2d 5, 11–12 (1st Cir. 1985) (discussing differences between a motion for summary judgment and a motion for judgment on a stipulated record)). Here, the Court notes at the outset that there are no material factual disputes, rather this

case presents a dispute as to statutory interpretation. Ultimately, the cross-motions and record filed here queue up this matter for resolution in accordance with Federal Rule of Civil Procedure 52.[1] See OneBeacon America Ins. Co. v. Johnny's Selected Seeds Inc., No. 1:12-cv-00375-JAW, 2014 U.S. Dist. LEXIS 53098 (D. Me. April 17, 2014). With this procedural lens set, the Court first explains the statutes at issue and then briefly summarizes the undisputed facts.

## II.      STATUTORY BACKGROUND

As the State Defendants explain in their Motion, consumer credit reports "can determine whether, and on what terms, a person may obtain a mortgage, a student loan, a credit card, or other financing." (Defs. Mot. (ECF No. 16), PageID # 166.) Given this impact, it is no surprise that these reports have been the subject of both federal and state regulation. The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, was enacted by Congress in 1970 to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007) (citing 15 U.S.C. § 1681). The FCRA "regulates the creation and the use of consumer report[s] by consumer reporting agenc[ies] for certain specified purposes, including credit transactions, insurance, licensing, consumer-initiated business transactions, and employment." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1545 (2016) (internal quotation marks omitted).

In Maine, the current version of the Maine Fair Credit Reporting Act, 10 M.R.S.A. § 1306 *et seq.*, was enacted in 2013 with the Legislature's announced purpose being to supplement the FCRA and "[r]equire consumer reporting agencies to adopt reasonable procedures for meeting the

---

[1] Although Plaintiff recites the summary judgment standard in its Motion (ECF No. 15, PageID # 149), the parties previously agreed to this alternative procedure and thereafter submitted a stipulated record (ECF Nos. 13 & 14) along with motions titled to reflect that each seeks "judgment" on that record (ECF Nos. 15 & 16). See 1/6/20 Procedural Order (ECF No. 12) (noting parties' agreement to "submit this matter to the Court on a stipulated record").

needs of commerce for consumer credit, personnel, insurance and other information in a manner that is fair and equitable to the consumer, with regard for confidentiality, accuracy, relevancy and proper use of this information . . . ." 10 M.R.S.A. § 1307. In this case, Plaintiff seeks a declaration that two specific 2019 amendments to Maine's Fair Credit Reporting Act (the "Maine Amendments") are preempted by the FCRA.

### A. FCRA

The text and history of two sections of the FCRA, 15 U.S.C. §§ 1681c & 1681t, are central to this preemption question. Until 1996, § 1681t comprised only a short savings clause, limiting federal preemption to the extent a state law was inconsistent with a provision of the FCRA:

> This subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.

15 U.S.C. § 1681t (1995). As to § 1681c, it was then titled "Reporting of obsolete information," and, true to its title, set out time periods beyond which certain information could not be reported on consumer reports. 15 U.S.C. § 1681c (1995).

In 1996, Congress amended both sections. As to § 1681t, new subsections were added and a series of exceptions were carved out of the savings clause, now labeled § 1681t(a), which was amended as follows:

> **Except as provided in subsections (b) and (c)**, this subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, **or for the prevention or mitigation of identity theft,** except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.

15 U.S.C. § 1681t(a) (1998). Contained within "subsection (b)" was § 1681t(b)(1)(E), in substantially its present form:

3

> (b) General exceptions. No requirement or prohibition may be imposed under the laws of any State—
>> (1) with respect to any subject matter regulated under— . . .
>>> (E) [15 U.S.C. § 1681c], relating to information contained in consumer reports, except that this subparagraph shall not apply to any State law in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996;

The changes to § 1681t also included a sunset provision on the new subsections reading, in relevant part, as follows:

> (d) Limitations. Subsections (b) and (c)— . . .
>> (2) do not apply to any provision of State law (including any provision of a State constitution) that—
>>> (A) is enacted after January 1, 2004;
>>> (B) states explicitly that the provision is intended to supplement this subchapter; and
>>> (C) gives greater protection to consumers than is provided under this subchapter.

15 U.S.C. § 1681t(d) (1998). In parallel, § 1681c was retitled "Requirements relating to information contained in consumer reports." Its first subsection, § 1681c(a), still only pertained to obsolete information, but was retitled "Information excluded from consumer reports." New subsections were added containing requirements not relating to obsolescence, including a subsection titled "Information required to be disclosed," § 1681c(d).

In 2003, both sections were again amended. As to § 1681t, new additions included § 1681t(b)(5)(C), while the sunset provision was deleted. Section 1681t(b)(5)(C) states:

> (b) General exceptions. No requirement or prohibition may be imposed under the laws of any State— . . .
>> (5) with respect to the conduct required by the specific provisions of— . . .
>>> (C) [15 U.S.C. § 1681c-2].

As relevant here, § 1681c-2 requires credit reporting agencies to "block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft." 15 U.S.C. § 1681c-2(a). As to § 1681c, additions included

§ 1681c(a)(6), which restricts when the contact information of medical information furnishers can be included in a consumer report.[2] However, § 1681c(a)(6) does not limit the reporting of medical debts, but instead seeks to prevent the incidental disclosure of information from which a consumer's medical information can be inferred.

In 2018, § 1681c was again amended, adding restrictions on when a *veteran's* medical debt can first be reported and requiring the removal of such debt once fully paid and settled.[3] 15 U.S.C. § 1681c(a)(7) & (8).

### B. The Maine Amendments

In 2019, the Maine Legislature passed two amendments to the Maine Fair Credit Reporting Act, both of which became effective on September 19, 2019. The first amendment was titled "An Act Regarding Credit Ratings Related to Overdue Medical Expenses" (the "Medical Debt Provision"). See 2019 Me. Laws 266, P.L. 2019, ch. 77. As enacted, the Medical Debt Provision places restrictions on when a medical debt may be included in a consumer report:

> Notwithstanding any provision of federal law, a consumer reporting agency shall comply with the following provisions with respect to the reporting of medical expenses on a consumer report.
> A. A consumer reporting agency may not report debt from medical expenses on a consumer's consumer report when the date of the first delinquency on the debt is less than 180 days prior to the date that the debt is reported.
> B. Upon the receipt of reasonable evidence from the consumer, creditor or debt collector that a debt from medical expenses has been settled in full or paid in full, a consumer reporting agency:

---

[2] "Medical information furnisher" is elsewhere defined as "[a] person whose primary business is providing medical services, products, or devices. . . who furnishes information to a consumer reporting agency on a consumer . . . ." 15 U.S.C. § 1681s-2.

[3] Since 2019, nearly twenty bills have been introduced to further amend § 1681c. One House bill contains both restrictions on the reporting of medical debts and a procedure for removing debts that were the product of "financial abuse" from credit reports. See Comprehensive Credit Reporting Enhancement, Disclosure, Innovation, and Transparency Act of 2020, H.R. 3621, 116th Cong. (2020); see also, e.g., Patient Credit Protection Act of 2020, S. 4037, 116th Cong. (2020); Coronavirus Credit Lapse Forgiveness Act, H.R. 6413, 116th Cong. (2020); Medical Debt Relief Act of 2020, H.R. 6470, 116th Cong. (2020).

> > (1) May not report that debt from medical expenses; and
> > (2) Shall remove or suppress the report of that debt from medical expenses on the consumer's consumer report.
> 
> C. As long as the consumer is making regular, scheduled periodic payments toward the debt from medical expenses reported to the consumer reporting agency as agreed upon by the consumer and medical provider, the consumer reporting agency shall report that debt from medical expenses on the consumer's consumer report in the same manner as debt related to a consumer credit transaction is reported.

10 M.R.S.A. § 1310-H(4).

At Maine's legislative hearings on the Medical Debt Provision, Superintendent Lund, although not taking a position on the legislation, expressed concern over the effect the amendment would have on the accuracy of consumer reports. (Joint Ex. C (ECF No. 13-3), PageID # 46.) Additionally, multiple testifiers, including the Superintendent, expressed uncertainty over what was encompassed by "regular, scheduled periodic payments." (Id., PageID #s 43, 45.) As it related to the three nationwide credit reporting agencies, the Superintendent also noted that the first two sub-provisions would not change the status quo, because they had agreed to the same terms in a settlement with New York's attorney general.[4] (Id., PageID # 45.)

The second amendment came via a state law titled "An Act to Provide Relief to Survivors of Economic Abuse" (the "Economic Abuse Provision"). See 2019 Me. Laws 1062, P.L. 2019, ch. 407. Under the Economic Abuse Provision, if a consumer provides evidence to a credit reporting agency that a debt is the product of "economic abuse," the agency is required to reinvestigate the debt and, if the allegation is borne out, remove references to the debt from the consumer's report:

> Except as prohibited by federal law, if a consumer provides documentation to the consumer reporting agency . . . that the debt or any portion of the debt is the result

---

[4] The Court infers from this testimony that the three nationwide consumer reporting agencies adopted the reporting practices required under 10 M.R.S.A. § 1310-H(4)(A) & (B) prior to Maine's enactment of the Medical Debt Provision in accordance with this settlement.

> of economic abuse . . . the consumer reporting agency shall reinvestigate the debt. If after the investigation it is determined that the debt is the result of economic abuse, the consumer reporting agency shall remove any reference to the debt or any portion of the debt determined to be the result of economic abuse from the consumer's credit report.

10 M.R.S.A. § 1310-H(2-A). Economic abuse is defined as follows:

> "Economic abuse" means causing or attempting to cause an individual to be financially dependent by maintaining control over the individual's financial resources, including, but not limited to, unauthorized or coerced use of credit or property, withholding access to money or credit cards, forbidding attendance at school or employment, stealing from or defrauding of money or assets, exploiting the individual's resources for personal gain of the defendant or withholding physical resources such as food, clothing, necessary medications or shelter.

19 M.R.S.A. § 4002(3-B). Credit reporting agencies can be subject to both administrative enforcement and private party litigation for violating the Maine Fair Credit Reporting Act. See 10 M.R.S.A. § 1310-A. An agency may not be held liable, however, if it "shows by a preponderance of the evidence that at the time of the alleged violation the [agency] maintained reasonable procedures to ensure compliance with the provisions of" the amendments. 10 M.R.S.A. § 1310-H(3).[5]

As reflected in the stipulated record, the majority of the testimony concerning the Economic Abuse Provision focused on the policy considerations associated with economic abuse and its connection to domestic violence. See generally Joint Ex. D (ECF No. 13-4).

---

[5] It appears that there are two versions of this provision due to the separate passage of the Medical Debt Provision and the Economic Abuse Provision; the first applying to "subsections 1, 2 and 4" and the latter applying to "subsections 1, 2 and 2-A." 10 M.R.S.A. § 1310-H(3).

## III. STIPULATED FACTUAL BACKGROUND

In September 2019, CDIA filed the instant action to challenge the just-described amendments to the Maine Fair Credit Reporting Act.[6] CDIA is a trade association whose membership includes the three nationwide consumer credit reporting agencies—Experian, Equifax, and Trans Union—and other agencies. The parties stipulate that (1) CDIA's members will have to take affirmative steps and revise procedures to comply with the Maine Amendments; (2) members may be subject to both administrative enforcement and private party litigation if they fail to take such steps; and (3) Superintendent Lund has the authority to investigate and enforce the amendments, which may include a civil action with penalties for noncompliance. (Joint Stipulation of Facts (ECF No. 14), PageID #s 144–45.)

## IV. DISCUSSION

Before addressing the substantive preemption arguments raised in the parties' briefing,[7] the Court initially considers the issue of subject matter jurisdiction.

### A. Subject Matter Jurisdiction

"Federal courts . . . cannot act in the absence of subject matter jurisdiction, and they have a sua sponte duty to confirm the existence of jurisdiction . . . ." United States ex rel. Willette v. University of Mass., 812 F.3d 35, 44 (1st Cir. 2016). Acknowledging that the State Defendants had previously raised both standing and ripeness as potential defenses to this action, Plaintiff

---

[6] Plaintiff is also litigating parallel preemption challenges to state laws in New Jersey and Texas. See Consumer Data Indus. Ass'n v. Grewal, D. N.J. 3:19-cv-19054-BRM-TJB; Consumer Data Indus. Ass'n v. Texas, W.D. Tex. 1:19-cv-00876-RP.

[7] In addition to the parties' briefing, the Court has reviewed and considered amicus briefs filed by the Maine Coalition to End Domestic Violence (ECF Nos. 18 & 30), the National Consumer Law Center and Maine Equal Justice (ECF No. 29), and the American Financial Services Association (ECF No. 33). The Court notes that, to the extent some of these briefs offered compelling descriptions of the policy considerations underlying the Maine Amendments, these policy considerations are not relevant to the preemption questions raised by the pending Motions. See, e.g., Pl. Response (ECF No. 40), PageID #s 350–53.

asserts that it has standing to pursue this challenge on behalf of its members and that the matter is ripe. (Pl. Mot. (ECF No. 15), PageID #s 150–53.) The Court agrees on both points.

As to standing, "[w]hen an unincorporated association seeks to open the doors of a federal court, it must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Merit Constr. All. v. City of Quincy, 759 F.3d 122, 126–27 (1st Cir. 2014) (quoting Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)). Here, the Court agrees with Plaintiff that these three factors are satisfied on the stipulated facts and notes that the State Defendants have not responded to Plaintiff's assertion of standing.[8] (See Pl. Mot., PageID # 150–53.)

As the party raising a statutory challenge, Plaintiff also has the burden of demonstrating ripeness. Reddy v. Foster, 845 F.3d 493, 501 (1st Cir. 2017). "The basic rationale of the ripeness inquiry is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements in violation of Article III's case or controversy requirement." Labor Rels. Div. of Constr. Indus. of Mass. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016). "A claim

---

[8] Regardless of the lack of developed argument on this issue of standing, the Court acknowledges that "subject matter jurisdiction claims are not waivable." Elgin v. United States Dep't of the Treasury, 641 F.3d 6, 9 (1st Cir. 2011). Thus, the Court has independently considered CDIA's standing as a trade association, particularly as to the Medical Debt Provision. As it relates to that provision, it is not apparent that CDIA's members are not already required to substantially handle reporting of medical debts in accordance with 10 M.R.S.A § 1310-H(4) due to a preexisting settlement, which was noted in Superintendent Lund's testimony on the legislation. See Joint Ex. C, PageID # 45. At minimum, CDIA has not identified a member not bound by that settlement's restrictions on the reporting of medical debts. Nonetheless, on the record presented, the Court notes that § 1310-H(4)(C) creates additional information removal obligations for CDIA's members beyond what seems to be encompassed by the settlement. Additionally, the Court finds that CDIA's members would suffer the requisite harm from the State Defendants' independent enforcement of 10 M.R.S.A § 1310-H(4). See Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016) (explaining that associational standing on behalf of its members "requires, among other things, that at least one of the group's members have standing as an individual. To satisfy this requirement, the association must, at the very least, identify a member who has suffered the requisite harm.'") (internal citations, quotation marks & alterations omitted).

is ripe only if the party bringing suit can show both that the issues raised are fit for judicial decision at the time the suit is filed and that the party bringing suit will suffer hardship if court consideration is withheld." Id. (internal quotation marks omitted). "Even a facial challenge to a statute is constitutionally unripe until a plaintiff can show that federal court adjudication would redress some sort of imminent injury that he or she faces." Reddy, 845 F.3d at 501.

Despite the case being in a pre-enforcement posture, the Court deems Plaintiff's claims sufficiently ripe. First, Plaintiff's claims involve "purely legal questions, where the matter can be resolved solely on the basis of the state and federal statutes at issue." Capron v. Office of the Att'y Gen. of Mass., 944 F.3d 9, 20 n.4 (1st Cir. 2019) (quoting Labor Rels. Div., 844 F.3d at 327). There also does not appear to be any question that the State Defendants intend to enforce the Maine Act amendments. See id.[9]

Satisfied that this Court has the requisite subject matter jurisdiction, the Court next turns to the merits.

### B. Federal Preemption

"The Supremacy Clause supplies a rule of priority. It provides that the 'Constitution, and the Laws of the United States which shall be made in Pursuance thereof,' are 'the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.' Art. VI, cl. 2." Virginia Uranium, Inc. v. Warren, 139 S. Ct. 1894, 1901 (2019). "This Clause gives Congress 'the power to preempt state law,' which Congress may exercise either expressly or impliedly." Capron, 944 F.3d at 20–21. "Congressional intent is the touchstone of any effort to

---

[9] While the parties have not stipulated that the State Defendants actually intend to enforce the amendments, on the record presented the Court concludes that the State Defendants intend to do so. Cf. June Med. Servs. L.L.C. v. Russo, 140 S. Ct. 2103, 2118 (2020) ("The State's unmistakable concession of standing as part of its effort to obtain a quick decision from the District Court on the merits of the plaintiffs' undue-burden claims bars our consideration of it here.").

10

map the boundaries of an express preemption provision.  To illuminate this intent, [the Court] start[s] with the text and context of the provision itself[,] [as] . . . informed by the statutory structure, purpose, and history." Tobin v. Federal Express Corp., 775 F.3d 448, 452–53 (1st Cir. 2014).  Ultimately, "all preemption arguments, must be grounded in the text and structure of the statute at issue." Kansas v. Garcia, 140 S. Ct. 791, 804 (2020) (internal quotation marks omitted)).

The burden to prove preemption rests with Plaintiff.  Capron, 944 F.3d at 21.  When considering a preemption challenge, the Court begins with the "presumption that a federal act does not preempt an otherwise valid state law, and [the Court] set[s] aside that postulate only in the face of clear and contrary congressional intent." Antilles Cement Corp. v. Fortuño, 670 F.3d 310, 323 (1st Cir. 2012).  This "presumption against pre-emption is rooted in respect for the States as independent sovereigns in our federal system and assume[s] that Congress does not cavalierly pre-empt state laws." Tarrant Reg'l Water Dist. v. Herrmann, 569 U.S. 614, 631 n.10 (2013) (internal quotation marks omitted).  However, preemption is also "not a matter of semantics.  A State may not evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." Wos v. E.M.A., 568 U.S. 627, 636 (2013).

### 1.  15 U.S.C. § 1681t(b)(1)(E)

Plaintiff's chief argument is that the two Maine Amendments are expressly preempted by 15 U.S.C. § 1681t(b)(1)(E).  The parties primarily disagree over how broadly the following language in § 1681t(b)(1)(E) should be understood: "with respect to any subject matter regulated under . . . [15 U.S.C. § 1681c], relating to information contained in consumer reports . . . ."  Plaintiff contends that this language should be read to encompass all claims relating to information contained in consumer reports, with the phrase "relating to information contained in consumer

reports" effectively acting as a description of the subject matter § 1681c regulates. The State Defendants, by contrast, argue that the Court should read § 1681c as an itemized list of narrowly delineated subject matters, some of which relate to information contained in consumer reports, and only find preemption where a state imposes a requirement or prohibition that spills into one of those limited domains.

In further support of their narrow reading, the State Defendants argue that Plaintiff's reading of § 1681t(b)(1)(E) would result in surplusage. Namely, Plaintiff's reading would render the words "regulated under . . . [§ 1681c]" unnecessary. (Id., PageID # 180–82.) Rather, the State Defendants contend, the true inquiry, as further informed by a historic presumption against preemption, is whether a specific subsection of § 1681c "actually regulates the same duties as the state law." (Id., PageID # 176.) They contend that, under this narrow construction, the Maine Amendments do not impose prohibitions or requirements with respect to a subject matter regulated under § 1681c.

In considering these two different readings, the Court looks to the various amendments made to 15 U.S.C. §§ 1681t & 1681c. As to § 1681t, under the unamended savings clause, preemption expressly applied only "to the extent that [state] laws [were] inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency." 15 U.S.C. § 1681t (1995). However, through amendments enacted in 1996 and 2003, Congress carved a number of general exceptions from the savings clause. See 15 U.S.C. § 1681t(b). Key here, § 1681t(b)(1) now presents a list of eleven "subject matter[s]" "regulated under" other sections of the FCRA that are reserved to the federal government.

In parallel with the 1996 amendments to § 1681t, § 1681c was also amended using language similar to, or outright duplicative of, the language in § 1681t(b)(1)(E). Section 1681c

12

was retitled "Requirements *relating to information contained in consumer reports*" (emphasis added), and § 1681c(a) was retitled "Information excluded from consumer reports." Via these retitlings, Congress appears to have deliberately clarified the subject matters encompassed by § 1681c(a) and each of its subsections in order to coordinate its operation with § 1681t. See Altria Grp., Inc. v. Good, 555 U.S. 70, 76 (2008) ("Congress may indicate pre-emptive intent through a statute's . . . structure and purpose."). In the Court's reading, the amended language and structure of § 1681c(a) and § 1681t(b) reflect an affirmative choice by Congress to set "uniform federal standards" regarding the information contained in consumer credit reports. See Aldaco v. RentGrow, Inc., 921 F.3d 685, 688 (7th Cir. 2019) ("[Section 1681t(b)(1)(E)] assures that the Act establishes uniform federal standards for contents of credit reports—unless a state law in force in 1996 provides otherwise."); Simon v. DIRECTV, Inc., No. 09-cv-00852-PAB-KLM, 2010 U.S. Dist. LEXIS 35940, at *10 (D. Colo. Mar. 19, 2010) ("The CCCRA and FCRA provisions at issue concern the same subject matter, i.e. the type of information that can be legally disclosed in consumer reports."), *report and recommendation adopted*, 2010 U.S. Dist. LEXIS 35970 (D. Colo. Apr. 12, 2010); cf. Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1172 (9th Cir. 2009) ("The legislative history surrounding § 1681t(b)(1)(F) is murky, but there is evidence that the statutory scheme, which establishes national requirements and preempts most state regulation, was motivated at least in part by a desire for uniformity of reporting obligations."); Ritchie v. Northern Leasing Sys., No. 12-cv-4992-KBF, 2016 U.S. Dist. LEXIS 40537, at *60 (S.D.N.Y. Mar. 28, 2016) ("It is also unlikely that Congress intended FCRA § 1681m(a), the [FCRA's] notice provision, to be substantially made broader by patchwork state statutes, especially since it specifically listed § 1681m(a) as one of the provisions that would preempt state statutes on the same subject matter."). By seeking to exclude additional types of information, the Maine

Amendments intrude upon a subject matter that Congress has recently sought to expressly preempt from state regulation.[10]

Further, with respect to the Medical Debt Provision specifically, it is notable that § 1681c contains a provision concerning veterans' medical debt, which was added by Congress in 2018. See 15 U.S.C. § 1681c(a)(5), (8). Plaintiff asserts that this provision reflects that Congress has "expressly considered" the extent to which medical debts ought to be reported on consumer reports. (Def. Mot. (ECF No. 15), PageID # 161.) In response, the State Defendants argue that Plaintiff's assertion that Congress has spoken on the question of regulating medical debt is "something of an exaggeration." (Defs. Response (ECF No. 39), PageID # 330–31.) The Court disagrees. To be clear, a regulation of veterans' medical debt *is* a regulation of medical debt. To hold otherwise, and to say a regulation within a subject matter is not a regulation of a subject matter, would lead to untenable outcomes when applied to the rest of § 1681c. For instance, § 1681c(a)(3) prohibits the reporting of "[p]aid tax liens which, from date of payment, antedate the report by more than seven years." Under the State Defendants' interpretation, where regulation of the part does not imply the regulation of the whole, a state could still exclude paid tax liens

---

[10] The Court further notes that the since-deleted sunset provision stated that § 1681c(b) would not apply to state laws enacted after January 1, 2004 that both expressly stated their intent to supplement the FCRA and provided greater protections. Conversely, this language suggests that § 1681t(b)(1)(E), prior to the sunset provision, was not intended to allow for supplementation to the protections provided by § 1681c. Although the sunset provision was later retired, it is still evidence of the intended effect of § 1681t(b)(1)(E). See also Islam v. Option One Mortg. Corp., 432 F. Supp. 2d 181, 188 n.6 (D. Mass. 2006) ("[I]n 2003 Congress repealed the eight-year sunset provision of Section 1681t. The desire for uniformity again seemed to be the main concern . . . ." (internal citation omitted)).

generally.[11]   The Court declines to adopt this interpretation and thereby rejects the State Defendants' limited view of preemption.[12]

### 2.  15 U.S.C. § 1681t(b)(5)(C)

Plaintiff also contends that the Economic Abuse Provision is separately preempted, to the extent it requires a consumer reporting agency to reinvestigate "allegations of what amounts to identify theft and block reporting of that information," under 15 U.S.C. § 1681t(b)(5)(C).  (Pl. Mot. (ECF No. 15), PageID # 162–64.)  The Court declines to address this alternative argument in light of the above conclusion that both Maine Amendments are preempted under § 1681t(b)(1)(E).

### V.   CONCLUSION

For the reasons just given, the Court concludes as a matter of law that the Maine Amendments are preempted by 15 U.S.C. § 1681t(b)(1)(E).

Accordingly, the Court GRANTS Plaintiff's Motion for Judgment (ECF No. 15) and DENIES the State Defendants' Motion (ECF No. 16).

SO ORDERED.

                                                /s/ George Z. Singal  
                                                United States District Judge

Dated this 8th day of October, 2020.

---

[11] In a similar vein, § 1681c(a)(5) explicitly excludes "[a]ny other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years," and both medical debt and debt resulting from economic abuse would fall within the subject matter of "[a]ny other adverse item of information."

[12] The Court also notes Plaintiff's assertion that the exclusion of medical debts was "expressly considered" by Congress is supported by the Court's own research into the history of the various FCRA amendments.  In 2013—between the 2003 and 2018 amendments (the latter of which introduced the veterans' medical debt provision)—bills were introduced in both chambers of Congress to amend § 1681c to restrict the reporting of "[a]ny information related to a fully paid or settled medical debt that had been characterized as delinquent, charged off, or in collection which, from the date of payment or settlement, antedates the report by more than 45 days."  See Medical Debt Responsibility Act of 2013, S. 160, H.R. 1767, 113th Cong. (2013).  Neither bill made it out of committee.