# United States Court of Appeals
## For the First Circuit

No. 20-2064

CONSUMER DATA INDUSTRY ASSOCIATION,

Plaintiff, Appellee,

v.

AARON M. FREY in his official capacity as ATTORNEY GENERAL OF
THE STATE OF MAINE; WILLIAM N. LUND in his official capacity as
SUPERINTENDENT OF THE MAINE BUREAU OF CONSUMER CREDIT
PROTECTION,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Barron and Selya, Circuit Judges,
and Delgado-Hernández, District Judge.*

Christopher C. Taub for appellants.
Chi Chi Wu, with whom Andrea Bopp Stark, Ariel Nelson, and
Frank D'Alessandro were on brief for National Consumer Law Center,
Maine Equal Justice, and Maine Coalition to End Domestic Violence,
amici curiae.
Jennifer Sarvadi, with whom Rebecca E. Kuehn, Ryan P. Dumais,
and Hudson Cook LLP were on brief, for appellee.
Misha Tseytlin, with whom Sean T.H. Dutton, Kevin M. LeRoy,
David N. Anthony, Troutman Pepper Hamilton Sanders LLP, and Tara

* Of the District of Puerto Rico, sitting by designation.

S. Morrissey were on brief for American National Financial Services
Association and United States Chamber of Commerce, amici curiae.

———————————

February 10, 2022

———————————

DELGADO-HERNÁNDEZ, **District Judge**.  In 2019, Maine's Legislature passed two laws that amended the Maine Fair Credit Reporting Act, Me. Rev. Stat. Ann. tit. 10, §§ 1306 <u>et seq.</u> ("Maine Act"), to regulate the reporting of overdue medical debt and debt resulting from economic abuse.  After a facial preemption challenge to the laws from an industry group representing credit reporting agencies, the District Court held that both laws were preempted under Section 1681t(b)(1)(E) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 <u>et seq.</u>  We vacate and reverse the District Court's judgment, and remand for further proceedings addressing whether both laws may be partially preempted by Section 1681t(b)(1)(E), and whether the economic abuse debt reporting law may be separately preempted by Section 1681t(b)(5)(C).

I.

**A.**  **Background**

Consumer credit reports play an important role in the lives of individuals and in the economy.  As the District Court recognized, these reports influence whether, and on what terms, "a person may obtain a mortgage, a credit card, a student loan, or other financing."  <u>Consumer Data Indus. Ass'n.</u> v. <u>Frey</u>, 495 F. Supp. 3d 10, 13 (D. Me. 2020).  Mindful of this role, "Congress enacted the FCRA in 1970 as part of the Consumer Credit Protection

-3-

Act 'to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.'" Sullivan v. Greenwood Credit Union, 520 F.3d 70, 73 (1st Cir. 2008) (quoting Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007)). The FCRA "regulates the creation and the use of consumer report[s] by consumer reporting agenc[ies] for certain specified purposes, including credit transactions, insurance, licensing, consumer-initiated business transactions, and employment." Spokeo, Inc. v. Robins, 578 U.S. 330, 334-35 (2016) (alterations in original) (internal quotation marks omitted).[1]

Before passage of the FCRA, "there was little significant state regulation of the credit reporting industry." 2 Consumer Law Sales Practices and Credit Regulation § 534 (Sept. 2021). Since the passage of the FCRA, a number of states, including Maine, have enacted legislation patterned after the federal statute. Id. & n.3. The Maine Act was enacted in 1977. See Fair Credit Reporting Act, 1977 Me. Laws 945-54 (codified at

---

[1] Over the years, the FCRA has been subject to multiple amendments, including in 2018 to regulate the reporting of veterans' medical debt. See Fed. Trade Comm'n, 40 Years of Experience with the Fair Credit Reporting Act 1-16 (July 2011) "FTC Staff Report" (outlining history of FCRA and amendments); §1A Consumer Credit Law Manual §16.01, at 3-4, 7-14 (summarizing amendments); see, e.g., Economic Growth, Regulatory Relief, and Consumer Protection Act, Pub. L. No. 115-174, 132 Stat. 1296, 1332-35 (2018) (amending FCRA to address certain aspects of veterans' medical debt reporting).

Me. Rev. Stat. Ann. tit. 10, §§ 1311 et seq.); Equifax Servs., Inc. v. Cohen, 420 A.2d 189, 193-194 (Me. 1980) (describing statute).  The statute's current version goes back to 2013.  See An Act to Update the Fair Credit Reporting Act Consistent with Federal Law, 2013 Me. Laws 255-62 (codified at Me. Rev. Stat. Ann. tit. 10, §§ 1306 et seq.)  It has been amended several times.  Two such amendments are at issue here, "An Act Regarding Credit Ratings Related to Overdue Medical Expenses," 2019 Me. Laws 266 (codified at Me. Rev. Stat. Ann. tit. 10, § 1310-H(4)) ("Medical Debt Reporting Act"), and "An Act to Provide Relief to Survivors of Economic Abuse," 2019 Me. Laws 1062-64 (codified at Me. Rev. Stat. Ann. tit. 10, § 1310-H(2-A)) ("Economic Abuse Debt Reporting Act").[2]

The Medical Debt Reporting Act prohibits consumer reporting agencies from reporting "debt from medical expenses on a consumer credit report when the date of the first delinquency on the debt is less than 180 days prior to the date that the debt is reported." Me. Rev. Stat. tit. 10, § 1310-H(4)(A). Once a consumer reporting agency receives "reasonable evidence . . . that a debt from medical expenses has been settled in full or paid in full," it "[m]ay not report that debt" and "[s]hall remove or suppress

---

[2] To facilitate review, we also refer to the two Amendments as the "Amendments."

-5-

the report of that debt." Id. § 1310-H(4)(B). And if "the consumer
is making regular, scheduled periodic payments toward the debt
from medical expenses reported to the consumer reporting agency as
agreed upon by the consumer and the medical provider, the consumer
reporting agency must report that debt . . . in the same manner as
debt related to a consumer credit transaction is reported." Id.
§ 1310-H(4)(C). Driving the statute is the belief that, unlike
in the case of the purchase of a house or a car, medical debt is
usually unplanned and involuntarily incurred. See An Act
Regarding Credit Ratings Related to Overdue Medical Expenses:
Hearing on LD 110 Before the J. Standing Comm. on Health Coverage,
Ins. & Fin. Servs., 129th Legis. (2019) (statement of Rep. Chris
Johansen).

For its part, the Economic Abuse Debt Reporting Act
requires a credit reporting agency to reinvestigate a debt if the
consumer provides documentation that the debt is the result of
economic abuse. In the event the credit reporting agency
determines that the debt is the result of such abuse, it must
remove any reference to the debt from the consumer report. See
Me. Rev. Stat. Ann. tit. 10, § 1310-H(2-A). For this purpose,
"economic abuse" is defined as,

> causing or attempting to cause an individual
> to be financially dependent by maintaining
> control over the individual's financial
> resources, including, but not limited to,

-6-

> unauthorized or coerced use of credit or
> property, withholding access to money or
> credit cards, forbidding attendance at school
> or employment, stealing from or defrauding of
> money or assets, exploiting the individual's
> resources for personal gain of the defendant
> or withholding physical resources such as
> food, clothing, necessary medications or
> shelter.

See Me. Rev. Stat. Ann. tit. 19-A, § 4002(3-B). Underlying the Economic Abuse Debt Reporting Act is the belief that many domestic violence cases involve economic abuse. Accordingly, the statute seeks to help domestic violence victims regain control of their finances so they can leave abusive relationships and retake control of their lives. See An Act to Provide Relief to Survivors of Economic Abuse: Hearing on LD 748: Hearing before J. Standing Comm. on Judiciary, 129th Legis. (2019) (statement of Jessica L. Fay).

### B.  Proceedings Below

In September 2019, the Consumer Data Industry Association ("CDIA"), an international trade association whose membership includes the "Big Three" credit reporting agencies –– TransUnion, Equifax, and Experian –– and other agencies, sued Maine's Attorney General, Aaron M. Frey, and the Superintendent of the Maine Bureau of Consumer Credit Protection, William N. Lund (collectively the "State of Maine"), claiming that the Amendments are preempted by the FCRA.

-7-

In April 2020, the parties filed cross-motions for judgment on a stipulated record. CDIA argued in favor of a broad reading of the FCRA, claiming that the Amendments are preempted by 15 U.S.C. § 1681t(b)(1)(E), and the Economic Abuse Debt Reporting Act separately preempted by 15 U.S.C. § 1681t(b)(5)(C). See Consumer Data Indus. Ass'n., 495 F. Supp. 3d at 19 (summarizing arguments). To the contrary, the State of Maine argued that the operative language should be read more narrowly, preempting state law only for the specific or discrete subject matter of FCRA's regulations. Id.

The District Court agreed with CDIA, concluding that the Amendments are preempted by Section 1681t(b)(1)(E). See Consumer Data Indus. Ass'n., 495 F. Supp. 3d at 19-21. Given that it so concluded, the District Court declined to address CDIA's alternate argument that the Economic Abuse Debt Reporting Act is also preempted by Section 1681t(b)(5)(C). Id. at 21. This appeal ensued.

## II.

### A.  Standard of Review

When reviewing a district court's ruling on a motion for judgment on a stipulated record, we review legal conclusions de novo and factual findings for clear error. Thompson v. Cloud, 764 F.3d 82, 90 (1st Cir. 2014). Here, the dispute centers on the

-8-

District Court's legal conclusion that the Amendments are preempted, a topic to which we now turn.

**B.  Overview**

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  This Clause gives Congress "the power to preempt state law."  Capron v. Off. of Att'y Gen. of Mass., 944 F.3d 9, 21 (1st Cir. 2019). In general, there are "three different types" of preemption – "express," "conflict," and "field."  Murphy v. Nat'l Collegiate Athletic Ass'n, 138 S. Ct. 1461, 1480 (2018).  Express preemption occurs "when congressional intent to preempt state law is made explicit in the language of a federal statute."  Tobin v. Fed. Exp. Corp., 775 F.3d 448, 452 (1st Cir. 2014).  Conflict preemption takes place when state law imposes a duty that is "inconsistent – i.e., in conflict – with federal law."  Murphy, 138 S. Ct. at 1480.  Field preemption comes about when federal law occupies a field of regulation "so comprehensively that it has left no room for supplementary state legislation."  Id.

In this setting, our inquiry reduces to whether the Amendments are swept into the maw of FCRA preemption, and in particular, that of express preemption.  We concentrate on congressional intent, "the touchstone" of any effort to map the boundaries of an express preemption clause.  Tobin, 775 F.3d at

-9-

452. That intent may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992). "To illuminate this intent, we start with the text and context of the provision itself." Tobin, 775 F.3d at 452.

### C. Scope of Preemption

Congress formulated a general rule against preemption in the FCRA. To this end, the FCRA,

> [e]xcept as provided in subsections (b) and (c), does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, or for the prevention or mitigation of identity theft, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.

15 U.S.C. § 1681t(a). Simultaneously, Congress provided for exceptions to this general rule. One of the exceptions is set in Section 1681t(b)(1)(E), which reads,

> No requirement or prohibition may be imposed under the laws of any State—
> (1) with respect to any subject matter regulated under
> . . . .
> (E) section 1681c of this title, relating to information contained in consumer reports, except that this subparagraph shall not apply to any State law in effect on September 30, 1996.

-10-

15 U.S.C. § 1681t(b)(1)(E) (emphasis added).  Section 1681c
details specific information that must be excluded from consumer
reports, see 15 U.S.C. § 1681c(a)(1)-(8), as well as information
that must be disclosed in consumer reports, see 15 U.S.C.
§ 1681c(d)-(f).

        The parties disagree over how broadly the phrases
"relating to information contained in consumer reports" and "with
respect to any subject matter regulated under [Section 1681c]"
should be understood.  CDIA homes in on the phrase "relating to.
"And because the Amendments impose requirements or prohibitions
that relate to information contained in consumer reports, CDIA
claims they are preempted by the FCRA.

        We are not persuaded by CDIA's argument that Section
1681t(b)(1)(E) preempts all state laws "relating to information
contained in consumer reports," regardless of whether they
regulate subject matter regulated by Section 1681c.  That is not
the most natural reading of the statute's syntax and structure.
Congress drafted the line breaks in the statute so that a sentence
describing what was preempted as well as the phrase "subject matter
regulated under" would be completed by reference to a statutory
section or subsections, suggesting that it wanted to give the
statutory references a functional role in describing the regulated
"subject matter".  Such an approach also makes intuitive sense

-11-

because -- apart from field preemption, for which there is no persuasive evidence here -- the usual function of preemption provisions is to protect Congress' enactments from interference by state laws. Had Congress intended the "relating to" phrase alone to delimit the subject matter preempted, it could have drafted the statute differently, with the "relating to" clause directly following "subject matter" and setting off references to statutory sections with a comma.

The "relating to" clause can be plausibly read either as purely descriptive of the content of the statutory provisions or as modifying "subject matter" jointly with "regulated under section 1681c." In either case, though, the effect is the same: the content of the statutory provision plays a functional role in defining the scope of the subject matter preempted. By contrast, CDIA's proposed interpretation -- which treats the phrase "subject matter" as defined only by the phrase "relating to" -- renders the entire phrase, "regulated under section 1681c" surplusage. A statute, however, ought to be construed in a way that "no clause, sentence, or word shall be superfluous, void, or insignificant." Duncan v. Walker, 533 U.S. 167, 174 (2001) (quoting Market Co. v. Hoffman, 101 U.S. 112, 115 (1879)).

Furthermore, the impact of adopting CDIA's interpretation would not be isolated.  Congress used the same

-12-

statutory structure as that found in Section 1681t(b)(1)(E) throughout Sections 1681t(b)(1)(A)-(K). Thus, embracing CDIA's construction would make reference to all of the provisions listed in those sections surplusage, contrary to the well-known canon that, if possible, "every word and every provision" in a statute is to be given effect, none should be ignored, and none should be given an interpretation that causes it to have no consequence. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012). Each word Congress uses "is there for a reason." Advocate Health Care Network v. Stapleton, 137 S. Ct. 1652, 1659 (2017).

In the statutory provisions listed in Section 1681t(b)(1), Congress has legislated extensively but often narrowly - addressing particular kinds or uses of information or particular practices. Not only would CDIA's proposed interpretation render the references to the statutory provisions surplusage but it would also disregard the care and specificity with which Congress drafted those provisions.

That leads to the other component of this statutory structure, Section 1681t(b)(1)(E) and its mandate that no requirement or prohibition is to be imposed under the laws of any State "with respect to" any subject matter regulated under Section 1681c. In Dan's City Used Cars, Inc. v. Pelkey, 569 U.S. 251

-13-

(2013), the Supreme Court considered the preemptive scope of a provision in the Federal Aviation Administration Authorization Act ("FAAAA"), which prohibited enforcement of state laws "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." Id. at 261.  The Court observed that for purposes of FAAAA preemption, it is not sufficient that a state law relate to the "price, route, or service" of a motor carrier, but that it also concern a motor carrier's "transportation of property." Id.  The Court concluded that the phrase "with respect to" narrows the scope of preempted subject matter to its referent or referents. See id.

Following the same path, Section 1681t(b)(1)(E)'s mandate expresses Congress' intent only to preempt those claims that concern subject matter regulated under Section 1681c.  See Galper v. JP Morgan Chase Bank, N.A., 802 F.3d 437, 445-446 (2d Cir. 2015) (reaching similar conclusion in the context of identical language in Section 1681t(b)(1)(F)); Fishback v. HSBC Retail Servs. Inc., No. 12-0533, 2013 WL 3227458, at *16 (D.N.M. June 21, 2013) (Section 1681t(b) preempts state law concerning specific subject matters regulated under Sections 1681b, 1681c, 1681g, 1681i, 1681j, 1681m, 1681s and 1681w).[3]  So construed, the

_____

[3] See also Elizabeth D. De Armond, Preventing Preemption: Finding Space for States to Regulate Consumer Credit Reports, 2016 B.Y.U. L. Rev. 365, 402 & n.176 (2016) ("While the FCRA uses

-14-

preemption clause necessarily reaches a subset of laws narrower than those that merely relate to information contained in consumer reports.

CDIA argues that the phrase "any subject matter" is "a descriptive phrase, not a limiting one," and that by including in Section 1681t(b)(1)'s various subsections the specific provisions of the FCRA such as Section 1681c, Congress merely made "reference to the FCRA Section that governs the topic described."  The plain wording of a preemption clause "contains the best evidence of Congress' pre-emptive intent." Sprietsma v. Mercury Marine, 537 U.S. 51, 62-63 (2002) (quoting CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).  In Dan's City Used Cars, Inc., the Supreme Court noted that the addition of the words "with respect to" in the FAAAA "massively limit[ed] the scope of preemption" ordered by the statute.  569 U.S. at 261.  And while the preemption provision at issue here arises in a different federal statute, there is no basis to conclude that the effect of the language in each provision was not intended to be the same.  See Galper, 802 F.3d at 446 (so noting in applying Dan's City Used Cars, Inc.'s

_____

'relating to' in its preemption section, it does so only to describe the content of the specific preempting provisions.  It uses 'with respect to' to describe the relationship between the state law and the preempting subject matter.").

-15-

reading of the phrase "with respect to," to the same phrase under the FCRA).

As well, if as CDIA claims, Congress intended to preempt all state laws relating to information contained in consumer reports, it could have easily so stated. Congress knows how to preempt states from regulating entire subject areas. See e.g., Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378-79 (1992) (explaining that "[t]o ensure that the States would not undo federal deregulation with regulation of their own, the [Airline Deregulation Act] included a pre-emption provision, prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier" (quoting 49 U.S.C. app. § 1305(a)(1))).

Yet, that is not what happened with the FCRA. When legislators "did not adopt obvious alternative language, the natural implication is that they did not intend the alternative." Advocate Health Care Network, 137 S. Ct. at 1659 (internal quotation marks omitted) (quoting Lozano v. Montoya Álvarez, 572 U.S. 1, 16 (2014)). A legislature "says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992). Besides, as noted earlier, CDIA's construction would divest the phrase "regulated under" and the statutory references" of any real meaning, in

-16-

contravention of the "surplusage" canon. We cannot treat those words "as stray marks on a page - notations that Congress regrettably made but did not really intend." Advocate Health Care Network, 137 S. Ct. at 1659.

CDIA posits that "[i]f Congress intended states to be able to adopt laws governing the content of consumer reports," then there would have been no need for the savings clause found in Section 1681t(b)(1)(E). The clause provides that preemption as set forth therein "shall not apply to any State law in effect on September 30, 1996." Because the provision preempts states from enacting laws with respect to subject matters regulated under that Section, the clause serves to preserve pre-existing state laws even if they relate to regulated subject matters otherwise preempted by the FCRA. For that reason, there is no surplusage problem here.

CDIA maintains that legislative history reflects that Congress intended to expand the preemptive scope of the FCRA by establishing a uniform national standard related to information contained in credit reporting with which states could not interfere. We see no reason to presume that Congress intended, in providing some federal protection to consumers regarding the information contained in credit reports, to oust all opportunity for states to provide more protections, even if those protections

would not otherwise be preempted as "inconsistent" with the FCRA as under 15 U.S.C. § 1681t(a). This is not a case in which the federal government ousted states from regulating the field of consumer credit reports, and then stepped in to provide limited protections to consumers. The FCRA was first enacted to provide federal protections for consumers, including its prohibition on the reporting of obsolete "items of information" such as "[a]ny other adverse item of information which antedates the report by more than seven years," and states were at the same time free to provide additional protections, subject only to the prohibition on "inconsistent" state laws that now appears in Section 1681t(a). See FCRA, Pub. L. 91-508 §§ 605, 622, 84 Stat. 1130, 1136 (1970) (codified as amended at 15 U.S.C. §§ 1681t, 1681c); see also Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 1333 (9th Cir. 1995) ("The legislative history of the FCRA reveals that it was crafted to protect consumers from the transmission of inaccurate information about them . . . ."). And even where Congress has chosen to preempt state law, it is not ousting states of regulatory authority; state regulators have concurrent enforcement authority under the FCRA, subject to some oversight by federal regulators. See 15 U.S.C. § 1681s(c).

In any case, given that the language of the statute is unambiguous, we find it unnecessary to dwell further on its

-18-

legislative history. See Conn. Nat'l Bank, 503 U.S. at 254 ("When the words of a statute are unambiguous, then, th[e] first canon [of statutory construction] is also the last: 'judicial inquiry is complete.'" (quoting Rubin v. United States, 449 U.S. 424, 430 (1981)). What is more, if Congress intended to impose that degree of uniformity, it could have accomplished this objective by prohibiting all state regulation of content of consumer reports. But "Congress did not write the statute that way." Russello v. United States, 464 U.S. 16, 23 (1983). Instead, it inserted the phrase "regulated under" to delimit the operative range of preemption. We "cannot revisit that choice." Lozano v. Montoya Álvarez, 572 U.S. 1, 16 (2014).

CDIA directs our attention to the possible negative effects that a ruling favoring the State of Maine on this issue might have on the national economy and the difficulties that the consumer-credit industry might face if credit reporting agencies have to comply with what it refers to as a "patchwork of state laws."[4] In response, the State of Maine argues that CDIA

---

[4] Along the same line, Amici American National Financial Services Association and United States Chamber of Commerce assert that: allowing States to disturb the national consumer-reporting industry with state-specific standards runs the risk of upsetting the carefully balanced interests under the FCRA, in their view returning the industry to its limited, local focus that obtained generations ago; the cost of determining which state law or laws applied and of complying with those laws, could easily compel a consumer lender to operate solely within a single State, or to

-19-

overstates those effects.  With a statutory text and structure such as we have examined, weighing of policy is up to Congress. See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 13-14 (2000) ("Achieving a better policy outcome . . . is a task for Congress, not the courts."); United States v. Noland, 517 U.S. 535, 541 n.3 (1996) ("Noland may or may not have a valid policy argument, but it is up to Congress, not this Court, to revise that determination if it so chooses."); Madison Cnty., N.Y. v. U.S. Dep't. of Just., 641 F.2d 1036, 1041 (1st Cir. 1981) ("Whatever may be thought to be sound public policy should be up to Congress.").

### D.   Areas of Regulation

Having identified the domain of preemption under Section 1681t(b)(1)(E), we look into the statutory provisions that define its scope, for those separate what Congress preempted from what it did not preempt.  In this endeavor, we zero in on Sections 1681c (a)(1)-(5), 1681c(b), 1681c(a)(7) and 1681c(a)(8).

---

exit the lending industry altogether; State regulations may inhibit the assembly of comprehensive credit reports, undermining their predictive value and increasing lending risk; and individual state regulation would frustrate consumers as they move, commute, and deal with business from across state lines, all of which would reduce lending competition across the country, driving up interest rates for some consumers, and foreclosing access to credit for others.

### i. **Sections 1681c(a)(1)-(5) and 1681c(b)**

To begin, pursuant to Section 1681c(a), no consumer reporting agency may make any consumer report "containing any of the following items of information:"

> (1) Cases under Title 11 or under the Bankruptcy Act that, from the date of entry of the order for relief or the date of adjudication, as the case may be, antedate the report by more than 10 years.
>
> (2) Civil suits, civil judgments, and records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period.
>
> (3) Paid tax liens which, from date of payment, antedate the report by more than seven years.
>
> (4) Accounts placed for collection or charged to profit and loss which antedate the report by more than seven years.
>
> (5) Any other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.[5]

See 15 U.S.C. § 1681c(a)(1)-(5). The list covers information to be excluded from credit reports, in a progression that moves from

---

[5] We note that "there is a simple scrivener's error" in Section 1681c(a)(5). Moran v. Screening Pros., LLC, 943 F.3d 1175, 1183 n.6 (9th Cir. 2019). Thus, a comma should be included to separate the exclusionary clause as follows, "Any other adverse item of information, other than records of convictions of crimes [,] which antedates the report by more than seven years." Id.

bankruptcy cases (Section 1681c(a)(1)), to civil suits, judgments and arrests (Section 1681c(a)(2)), paid tax liens (Section 1681c(a)(3)), and accounts placed for collection (Section 1681c(a)(4)).

Fairly read, all of these categories comprise adverse items of information, and immediately precede Section 1681c(a)(5), which adds to the category of material to be excluded from reports, "[a]ny other adverse item of information, other than records of conviction of crimes[,] which antedates the report by more than seven years." Id. § 1681c(a)(5). The catch-all language is broad enough to cover medical debt and debt resulting from domestic abuse, which consist of adverse items of information not covered by the immediately preceding provisions. See FTC Staff Report, supra at 57 (Section 1681c(a)(5) applies to "all adverse information that is not covered" by Sections 1681c (a)(1)-(4)).[6]

_____

[6] As originally legislated as part of the FCRA in 1970, Section 1681c (a)(5) was enacted as Section 1681c(a)(6). See Moran, 943 F. 3d at 1182 (describing original enactment). In 1990, the Federal Trade Commission (FTC), the agency with original interpretative authority over the FCRA, released a report providing guidance on the statute. See Fed. Trade Comm'n, Commentary on the Fair Credit Reporting Act, 55 Fed. Reg. 18,804 (May 4, 1990) ("FTC Staff Commentary"). The Commentary states that the catch-all provision applied "to all adverse information that is not covered" by Section 1681c(a)(1)-(5). Id. at 18,818. In 1998, Congress amended the FCRA, including Section 1681c(a)(6). As a result, the catch-all provision became Section 1681c(a)(5). See Moran, 943 F.3d at 1183 (noting change). In 2011, as primary interpretative authority was being handed over from the FTC to the Consumer Financial Protection Bureau, the FTC issued a staff report

Measuring the reach of preemption, Section 1681c(a)(5) points to age. Subject to three exceptions found in Section 1681c(b), it prohibits consumer reporting agencies from reporting adverse information that is more than seven years old.[7] Correspondingly, agencies may report that information, provided it does not predate the report for more than seven years. Id. But they are not required to do so. See FTC Staff Report, supra at 55 (Section 1681c(a)(5) does not require consumer reporting agencies "to report all adverse information within the time period[] set forth, but only prohibits them from reporting adverse items beyond [that] time period[]").

In drafting (a)(1)-(a)(5) of Section 1681c, Congress defined the subject matter, the kinds and uses of information, it was regulating narrowly and with specificity: information older than seven years relating to bankruptcies, civil suits, civil judgments, records of arrest, paid tax liens, accounts in collection, or that is otherwise adverse.

---

withdrawing the 1990 Commentary. See FTC Staff Report, supra at 8. As noted in the text, for Section 1681c(a)(5) the Staff Report maintained the position the Commentary had adopted in 1990 in connection with then Section 1681c(a)(6). Id. at 57.

[7] See De Armond, supra at 408 ("[T]he FCRA provision is less about the substantive character of the information and much more about its age. The provision establishes that information is sufficiently 'fresh' only for the designated period of time, without governing the content itself.").

-23-

On appeal to us, CDIA has not developed any argument as to whether and how the Amendments might trench on this more circumscribed "subject matter" -- i.e., the "items of information" listed in Section 1681c(a). Thus, given the arguments made to us, we vacate the District Court judgment finding that Section 1681t(b)(1)(E) preempts the Maine Amendments in their entirety, and remand to the District Court for further proceedings consistent with this opinion.[8]

### ii. **Sections 1681c(a)(7) and 1681c(a)(8)**

CDIA posits that the Medical Debt Reporting Act is preempted because it regulates the same subject matter as Sections 1681c(a)(7) and 1681c(a)(8). These sections regulate the reporting of veterans' medical debt. To CDIA's way of thinking, because regulation of veterans' medical debt is regulation of

---

[8] CDIA has not developed on appeal any argument that Section 1681c preempts the Amendments based on a theory of implied preemption (of either the field, obstacle, or impossibility variety). See Murphy, 138 S. Ct. at 1480 (describing different theories of implied preemption). Any such argument is therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). We focus, as did the District Court, on whether Section 1681t(b) expressly preempts the Amendments. See Consumer Data Indus. Ass'n, 495 F. Supp. 3d at 19-20 ("Plaintiff's chief argument is that the two Maine Amendments are expressly preempted . . . . the Maine Amendments intrude upon a subject matter that Congress has recently sought to expressly preempt from state regulation.").

medical debt, it is preempted by the FCRA.  But that these sections carry special rules when it comes to veterans' medical debt as regulated in the statute, does not mean that they more broadly regulate the subject matter of medical debt reporting, given that medical debt afflicting veterans is not the only type of medical debt Congress could have regulated.

Consider medical debt besetting law enforcement officers, firefighters, health-care workers, education workers, construction workers, manufacturing workers, transportation workers, retail-sale workers, public employees, individuals in other labor markets, as well as that burdening independent contractors, retirees and a myriad of persons found in other sectors of the U.S. economy.  If Congress had intended to regulate the reporting of all those instances of medical debt it could simply have said so, without textually limiting the field of regulation to veterans' medical debt.  And that is not what it did.[9]  In consequence, we conclude that Sections 1681c(a)(7) and

_____

[9] In 2013, Senator Merkley and others presented an amendment to Section 1681c(a) to delete from credit reports "[a]ny information related to a fully paid or settled medical debt that had been characterized as delinquent, charged off, or in collection which, from the date of payment or settlement, antedate[d] the report by more than 45 days."  See Medical Debt Responsibility Act of 2013, S. 160, 113th Cong. (2013).  Similarly, in 2018 Senator Merkley proposed an amendment to Section 1681c(a) to exclude from consumer reports "[a]ny information related to a medical debt if the date on which such debt was placed for collection, charged to profit or loss, or subjected to any similar action antedate[d] the

1681c(a)(8) only regulate the reporting of veterans' medical debt, not medical debt in general.

Although it is clear to us that Sections 1681c(a)(7) and 1681c(a)(8) have no preemptive effect for non-veterans' medical debt, the scope of their partial preemptive effect on the Maine Medical Debt Reporting Act as it applies to veterans' medical debt is less obvious. Because the parties have not heretofore briefed in any detail the issue of the partial preemptive scope and effect of Sections 1681c(a)(7) and 1681c(a)(8) on the Maine Medical Reporting Act, we think it best to permit the parties to develop those arguments in the District Court. We take no view of the extent of partial preemption of the Medical Debt Reporting Act at this time. Consequently, we vacate the District Court judgment, reverse the holding that regulation of non-veteran medical debt

---

report by less than 180 days," and "[a]ny information related to a fully paid medical debt that had been characterized as delinquent, charged off, or in collection which, from the date of payment or settlement, antedate[d] the report by more than 45 days." See 164 Cong. Rec. S 1482 (March 7, 2018). As the District Court observed, neither bill made it out of committee. By way of the Economic Growth, Regulatory Relief, and Consumer Protection Act of 2018, Congress did amend the FCRA to create protections for veterans in the reporting of certain medical collection debts, "to rectify problematic reporting of  medical debt included in a consumer report of a veteran due to inappropriate or delayed payment for hospital care, medical services, or extended care services provided in a non-Department of Veterans Affairs facility under the laws administered by the Secretary of Veterans Affairs," and "to clarify the process of debt collection of such medical debt." Id. § 302, 132 Stat. at 1332.

reporting is preempted, and remand for further proceedings addressing the partial preemptive effect of Sections 1681c(a)(7) and 1681c(a)(8) on the Maine Medical Debt Reporting Act.

### E. **15 U.S.C. § 1681t(b)(5)(C)**

CDIA contends that the Economic Abuse Debt Reporting Act is separately preempted by Section 1681t(b)(5)(C). This Section preempts any state law "with respect to the conduct required by the specific provisions of . . . [S]ection 1681c-2." In turn, Section 1681c-2 provides that "a consumer reporting agency shall block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of [certain supporting documentation]." 15 U.S.C. § 1681c-2.

According to CDIA, the definition of economic abuse under the Economic Abuse Debt Reporting Act includes conduct that qualifies as identity theft under the FCRA and requires consumer reporting agencies to "reinvestigate" allegations of identity theft and "block reporting of that information." And given that the FCRA already regulates identity theft in its Section 1681c-2 and establishes how consumer reporting agencies must respond in such cases, CDIA argues that the Economic Abuse Debt Reporting Act is preempted by Section 1681t(b)(5)(C).

-27-

The State of Maine disputes CDIA's thesis on two grounds. First, it posits that "economic abuse is not synonymous with identity theft." From its perspective, "there is little, if any, overlap between these two definitions."[10] Second, it observes that the conduct required by the Economic Abuse Debt Reporting Act is not the same conduct required by Section 1681c-2.[11] In its view, because both "the triggers for taking action" and "the actions that then must be taken are different," the Economic Abuse Act does not impose requirements or prohibitions regarding conduct

_____

[10] The State of Maine maintains that the "economic abuse" definition under the Economic Abuse Debt Reporting Act "is far broader because it includes all manner of conduct that would not be considered 'identity theft' under [the] FCRA" and, at the same time, "it is narrower because conduct that would be considered 'identity theft' under [the] FCRA" would qualify as economic abuse under the EAA "only if it was done for the purpose of 'causing or attempting to cause an individual to be financially dependent.'" It submits that "the run of the mill identity theft addressed by [the] FCRA is . . . committed for financial gain and not to control another person."

[11] On this account, the State of Maine observes that the Economic Abuse Debt Reporting Act "requires a consumer reporting agency, after being provided with specified documentation by a consumer that the debt is the result of economic abuse, to reinvestigate the debt and remove any reference to the debt it determines to be the result of economic abuse." Section 1681c-2, instead, "requires a consumer reporting agency, after being provided with specified documentation by a consumer that certain information was the result of alleged identity theft, to block that information and notify the furnisher." So, the State of Maine argues that under Section 1681c-2 the agency is not required to conduct any investigation, although it can remove the block in certain circumstances.

required by Section 1681c-2 and is thus not preempted by Section 1681t(b)(5)(C).

The District Court did not evaluate this issue given its decision that the Amendments were preempted by Section 1681t(b)(1)(E). As we are vacating the Judgment, we leave it to the District Court to determine in the first instance whether the Economic Abuse Debt Reporting Act is preempted by Section 1681t(b)(5)(C).

### III.

In sum, we conclude that Section 1681t(b)(1)(E) narrowly preempts state laws that impose requirements or prohibitions with respect to the specific subject matters regulated under Section 1681c. Along this line, the Amendments are not preempted in their entirety by Sections 1681c(a)(5) and 1681c(b). We do not address whether the Medical Debt Reporting Act or the Economic Abuse Debt Reporting Act is partially preempted by Section 1681t(b)(1)(E). Sections 1681c(a)(7) and 1681c(a)(8) do not preempt the Medical Debt Reporting Act insofar as it regulates non-veterans' medical debt. We take no position as to whether or to what extent those sections partially preempt the Medical Debt Reporting Act and remand that issue to the District Court for briefing by the parties. We likewise express no opinion on whether the Economic Abuse Debt Reporting Act is preempted by Section 1681t(b)(5)(C)

-29-

and leave it to the District Court to evaluate that issue in the first instance. Therefore, we vacate and reverse the Judgment, and remand for further proceedings consistent with this opinion. No costs awarded.