# EXHIBIT A

**UNITED STATES DISTRICT
COURT DISTRICT OF MAINE**

CONSUMER DATA INDUSTRY
ASSOCIATION,

and

THE THOMAS AGENCY, INC.,

Plaintiffs,

v.

AARON M. FREY IN HIS CAPACITY AS
ATTORNEY GENERAL OF THE STATE
OF MAINE,

and

LINDA J. CONTI, IN HER CAPACITY AS
SUPERINTENDENT OF THE MAINE
BUREAU OF CONSUMER CREDIT
PROTECTION

Defendants.

**Civil Action No. 1:19-cv-00438-LEW**

**AMENDED COMPLAINT**

**INJUNCTIVE RELIEF SOUGHT**

1.      Congress carefully crafted a nationwide regulatory framework to govern consumer reporting and, in doing so, preempted a substantial number of state laws that would interfere with the good working order of that framework.  Despite this, Maine has sought to undermine Congress's work by imposing a categorical ban on reporting and furnishing medical debt and debt resulting from "economic abuse."  This it cannot do.  Purporting to have the authority to act "notwithstanding any federal law," Maine has now forbidden consumer reporting agencies (CRAs) and furnishers from including truthful, accurate, and lawfully obtained information about medical obligations in consumer reports (including credit reports)—no matter the amount, age, delinquency

status, or repayment history.  Further, Maine has also purported to impose burdensome obligations on CRAs to investigate any debt claimed to be the result of "economic abuse," and forbids CRAs from including any such debt in consumer reports.  Those restrictions on consumer reporting conflict directly with the uniform national framework for consumer reporting and furnishing that Congress has established.

2.      Through the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, Congress created a comprehensive regulatory scheme for consumer reports and consumer reporting agencies.  Congress's purpose in enacting the FCRA was to balance dual goals: facilitating the intricate, nationwide system of consumer reporting that is relied upon by numerous industries, while also protecting consumers' privacy and reputational interests.

3.      After carefully weighing industry and consumer interests, Congress made specific determinations over time regarding what can and cannot be included in consumer reports, *see* 15 U.S.C. § 1681c, as well as the responsibilities of the companies that provide consumer information to CRAs (known as "furnishers"), including debt collectors and providers of consumer credit, *see id.* § 1681s-2.

4.      To ensure this carefully calibrated, nationwide regime did not become hopelessly fragmented, Congress also included in the FCRA provisions that broadly preempt state laws that would otherwise create a patchwork of reporting and furnishing obligations.

5.      The FCRA thus includes both a general "inconsistency" preemption clause that displaces state laws to the extent they conflict with the FCRA's provisions, *id.* § 1681t(a), and targeted, subject-matter preemption provisions that categorically bar States from imposing their own requirements in areas where Congress itself has regulated, *id.* § 1681t(b).  Additionally,

2

Congress also prohibited State regulation related to certain conduct regulated under the FCRA. *Id.* § 1681t(b)(5).

6.      As relevant here, the FCRA's subject-matter preemption provisions expressly preempt State laws that impose requirements "with respect to any subject matter regulated under" either: (i) "section 1681c [of the FCRA] relating to information contained in consumer reports," *id.* § 1681t(b)(1)(E); or (ii) "section 1681s-2 [of the FCRA] relating to the responsibilities of persons who furnish information to consumer reporting agencies," excepting specific pre-existing Massachusetts and California laws, *id.* § 1681t(b)(1)(F).

7.      The FCRA's conduct preemption provisions expressly preempt state laws that attempt to regulate "with respect to the conduct required by the specific provisions of . . . section 1681c-2." *Id.* § 1681t(b)(5)(C).  Section 1681c-2 delineates requirements for consumer reporting agencies to "block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft . . . ." *Id.* § 1681c-2(a).

8.      These provisions preserve national uniformity by prohibiting States from undercutting Congress's decisions as to what can and cannot be included in consumer reports and as to the requirements imposed on a consumer reporting agency for blocking information identified by the consumer as resulting from identity theft, among other things.  Under the FCRA's preemption framework, States cannot set their own, different rules about what CRAs can report, what information furnishers can provide to those CRAs, or what CRAs must do to block information resulting from identified identity theft.

9.      Maine's law prohibiting medical debt from appearing on consumer reports also unconstitutionally suppresses truthful commercial speech.  The First Amendment to the U.S. Constitution, as incorporated against the States by the Fourteenth Amendment, places additional

3

boundaries on how States may regulate the right to speak and the right to receive information. As relevant here, both furnishers and CRAs have a First Amendment right to convey truthful information about lawful transactions and consumer debts. Further, CRAs and the creditors and consumers who rely upon them also have a corresponding First Amendment right to receive to such speech.

10.     In 2019, Maine enacted L.D. 110, "An Act Regarding Credit Ratings Related to Overdue Medical Expenses," which purported to impose specific requirements on CRAs regarding when and how certain medical debt could be reported, including temporal reporting limitations. More specifically, L.D. 110 barred CRAs from reporting medical debt that had been delinquent for less than 180 days and required them to remove paid or settled medical debts from consumer reports.

11.     That same year, Maine also enacted L.D. 748, entitled "An Act to Provide Relief to Survivors of Economic Abuse," which purported to require CRAs to reinvestigate any reported debt upon receipt from a consumer of "documentation . . . that the debt or any portion of the debt is the result of economic abuse" as defined elsewhere by Maine law, and "[i]f after the investigation it is determined that the debt is the result of economic abuse," the law purports to require the consumer reporting agency to "remove any references to the debt or any portion of the debt determined to be the result of economic abuse from the consumer's credit report." Me. Rev. Stat. Ann. tit. 10, § 1310-H(2-A) (the "Economic Abuse Provision").

12.     Because Section 1681c of the FCRA expressly preempts state laws that govern what may appear on a consumer report, Plaintiff Consumer Data Industry Association ("CDIA") filed suit in 2019 to challenge L.D. 110 and L.D. 748 as preempted under Section 1681t(b)(1)(E)'s subject-matter preemption provision.

13. While CDIA's challenge to L.D. 110 and L.D. 748 was still pending, the Maine Legislature made far more extreme its effort to undermine Congress's uniform rules for reporting and furnishing consumer credit information, and to suppress speech on this topic. On June 9, 2025, it passed L.D. 588, "An Act to Strengthen Consumer Protections by Prohibiting the Report of Medical Debt on Consumer Reports" (the "Medical Debt Ban"), effective September 24, 2025.

14. The Medical Debt Ban transforms L.D. 110's (already preempted) timing rule into an outright ban on an entire category of credit information: CRAs are now barred from reporting *any* medical debt, and medical creditors, debt collectors, and other furnishers are prohibited from furnishing *any* medical-debt information.

15. More specifically, the Medical Debt Ban provides that (1) a "consumer reporting agency may not report medical debt on a consumer's consumer report," and (2) "a medical creditor, debt collector or debt buyer may not report a consumer's medical debt to a consumer reporting agency." Me. Rev. Stat. Ann. tit. 10, § 1310-H(4)(A).

16. Maine's new efforts to override Congress's decisions regarding the content of consumer reports and the obligations of furnishers and to silence truthful speech is preempted by the FCRA and violates the First Amendment.

17. The FCRA both expressly and impliedly preempts this new, expanded Medical Debt Ban. By categorically forbidding the reporting and furnishing of medical debt information "notwithstanding" federal law, Maine seeks to dictate what may appear in consumer reports and how furnishers may communicate with CRAs—subject matters that the FCRA expressly reserves to federal regulation. *See* 15 U.S.C. § 1681t(b)(1)(E); *id.* § 1681t(b)(1)(F). The FCRA's general "inconsistency" preemption provision also preempts the Medical Debt Ban here, which conflicts with other provisions of the FCRA acknowledging that CRAs may engage in medical debt

5

reporting, subject to certain narrow restrictions.  Moreover, the Medical Debt Ban stands as an obstacle to Congress's objectives of complete, accurate, and uniform consumer reporting, and is therefore impliedly preempted under the FCRA.

18.    In addition, the First Amendment prohibits Maine from silencing truthful speech by prohibiting communication about an entire category of information.  The Medical Debt Ban is a content-based restriction on truthful, non-misleading commercial speech: it singles out medical debt and forbids furnishers from communicating accurate information about those obligations to CRAs, while barring CRAs from receiving, compiling, and disseminating that information to the marketplace.

19.    Nor is a categorical ban on an entire class of accurate credit information narrowly tailored to any legitimate interest.  In particular, it is not narrowly tailored because it creates a ban that treats all medical debt the same, regardless of whether it was incurred as the result of an emergency, an illness, or purely elective, non-essential treatments.  The Medical Debt Ban conceals facts, distorts risk assessments, and deprives consumers and creditors of the benefits of complete credit files.  This provision thus violates the First Amendment's protections for commercial speech.

20.    If allowed to stand, the Medical Debt Ban will harm consumers, healthcare providers, and others who rely upon consistency and truthfulness in consumer reports.

21.    By prohibiting reporting of unpaid medical bills, the Medical Debt Ban degrades the consumer credit ecosystem.  Medical debt information paints a fuller, more accurate picture of a consumer's obligations and capacity to repay.  Consumer reports that omit an entire category of debt produce incomplete files, distort risk assessments, and force lenders to rely on guesswork to price and size credit.  By prohibiting speech about a massive swath of debt information from the

consumer reporting system, the Medical Debt Ban will make consumer reports far less useful and reliable and could lead to flawed underwriting, similar to that which caused the 2007 Financial Crisis.

22.     Indeed, studies show that one month after suppressing a medical debt from a consumer report, the average person experiences a 25-point artificial increase in their credit score; removing larger medical collections is correlated with even larger artificial score changes.[1]  With the consumer's credit score not reflecting his true level of indebtedness, a consumer can appear to have more credit capacity, allowing him or her to make additional purchases and take on new debt, while still remaining obligated on the debt hidden from view.  This increases risk for consumers and creditors alike.

23.     The predictable result is a credit "downgrade" for *all* borrowers in Maine—not just those who are unwilling or unable to pay their bills.  Because lenders cannot assess which Mainers have unpaid debts that might lead to legal action against them or drive them to bankruptcy, they will assume more hidden debt and respond by raising prices, raising interest rates, tightening terms, and reducing access to credit across the board.  This will most harm Maine consumers on the margin of being deemed creditworthy, such as those with thin or no credit files.

24.     In addition, the Medical Debt Ban fractures the national credit system—which depends upon uniform rules, complete and accurate data, and the efficient flow of truthful information—by forcing participants across the national credit ecosystem to build Maine-only processes, driving up compliance costs and undermining risk-based pricing that keeps credit affordable.

---

[1] Alyssa Brown and Eric Wilson, Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports, Consumer Financial Protection Bureau (Apr. 2023).

25.     The Medical Debt Ban also disrupts a system that allows healthcare providers to be paid.  Timely payment of medical bills sustains the doctors, dentists, clinics, and hospitals that care for our communities.  Including medical debt in consumer reports encourages payment discipline, reduces costly disputes and litigation, and helps ensure that providers—especially small, non-corporate, and rural practices—can keep their doors open and offer deferred billing and payment plans to their patients. Suppressing that information incentivizes nonpayment, shifting costs to providers and ultimately to consumers in the form of higher prices and reduced access to care.

26.     Congress enacted the FCRA and its preemption provisions to avoid this exact sort of state-level regulatory mayhem and its deleterious effects on all manner of commerce and consumers.

27.     Plaintiffs seek declaratory and injunctive relief to prevent enforcement of Maine's Medical Debt Ban and Economic Abuse Provision; to preserve the uniform national standards that govern consumer reporting and protect the lawful flow of accurate information that underpins the nation's credit markets and benefits consumers, creditors, and healthcare providers alike; and to vindicate their First Amendment rights.

## THE PARTIES

28.     Plaintiff CDIA is an international trade association founded in 1906, which is organized under the laws of Missouri with its principal place of business in Washington, D.C. CDIA's membership includes the three nationwide CRAs, Experian, Equifax, and TransUnion, and other CRAs that provide consumer reports concerning Maine consumers.

29.     In its more than 100-year history, CDIA has worked with the U.S. Congress and with state legislatures to develop laws and regulations governing the collection, use, maintenance, and dissemination of consumer report information.  In this role, CDIA participated in the efforts

leading to the enactment of the Fair Credit Reporting Act ("FCRA") in 1970 and every subsequent amendment to the FCRA. In this role, CDIA also represents the interests of the consumer reporting industry before every state legislature, and vindicates the rights of its members in court where appropriate and necessary.

30.    Plaintiff The Thomas Agency, Inc. is a privately owned debt collection company that has been in business since 1927, providing accounts receivable management solutions to significant healthcare providers across Maine. The medical providers that The Thomas Agency serves rely on it to ensure they are fairly paid for their services and can continue to operate in underserved areas. The economic consequences of promoting unpaid medical bills by prohibiting consumer reporting of medical debt as a means of debt collection impacts the hiring market for physicians, the availability of medical services, the provision of services before payment in full, the speed of insurance payments, and the ability of small non-corporate medical providers to remain in business. *See* Andrew Rodrigo Nigrinis, Ph.D., Economic Analysis of the Consumer Financial Protection Bureau's Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V) ("Nigrinis Report") ¶¶ 113-16 (July 2024), *available at* https://policymakers.acainternational.org/wp-content/uploads/2024/07/Andrew NigrinisEconomicAnalysis-CFPB-FCRA-NPRM-July2024.pdf. As part of its role in collecting on healthcare debt, The Thomas Agency is a furnisher of information to several consumer reporting agencies who are CDIA members.

31.    Defendant Superintendent Linda J. Conti is the state official responsible for the administration and enforcement of Maine's Fair Credit Reporting Act ("Maine FCRA") under Me. Rev. Stat. Ann. tit. 10, § 1310-A (entrusting enforcement powers to the "administrator") and Me.

9

Rev. Stat. Ann. tit. 10, § 1308(1) (defining "Administrator" as "the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation").

32. Defendant Attorney General Aaron M. Frey is the state official responsible for enforcement through civil action of the Maine FCRA under Me. Rev. Stat. Ann. tit. 10, § 1310-A(1)(A), (5).

## JURISDICTION AND VENUE

33. This action arises under the FCRA, 15 U.S.C. §§ 1681 *et seq*, specifically, 15 U.S.C. § 1681c and 1681t(b), the First Amendment of the U.S. Constitution, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

34. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

35. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this District.

## BACKGROUND

36. In 2019, through L.D. 110 and L.D. 748, the Maine Legislature amended the Maine FCRA to add certain categories of information that cannot be included in consumer reports. Specifically, these amendments purported to prohibit CRAs from reporting: (1) medical debt that has not been delinquent for more than 180 days; and (2) debts resulting from economic abuse.

37. On May 8, 2019, the Maine Legislature enacted L.D. 110, entitled "An Act Regarding Credit Ratings Related to Overdue Medical Expenses." This law was codified at 10 Me. Rev. Stat. Ann. tit. § 1310-H(4), and became effective on September 19, 2019 (the "original Medical Debt Provision").

38. On June 21, 2019, the Maine Legislature enacted L.D. 748, entitled "An Act to Provide Relief to Survivors of Economic Abuse." This law was codified at 10 Me. Rev. Stat. Ann. tit. § 1310-H(2-A), and became effective on September 19, 2019 ("Economic Abuse Provision").

10

39.     The original Medical Debt Provision prohibited CRAs from reporting "medical expenses" within a consumer report "when the date of the first delinquency on the debt is less than 180 days prior to the date that the debt is reported," *id.* § 1310-H(4)(A), or "[u]pon receipt of reasonable evidence . . . that a debt from medical expenses has been settled in full or paid in full," *id.* § 1310-H(4)(B) (2019).  At the same time, the law compelled CRAs to report medical debt for which the consumer was making regular, scheduled, periodic payments as agreed upon by the consumer and the medical provider.  *Id.* § 1310-H(4)(C) (2019).  The Maine legislature was clear that it intended this law to apply "[n]otwithstanding any provision of federal law."  *Id.* § 1310-H(4)(A) (2019).

40.     The Economic Abuse Provision requires CRAs to reinvestigate any reported debt upon receipt from a consumer of "documentation . . . that the debt or any portion of the debt is the result of economic abuse" as defined elsewhere by Maine law.  "If after the investigation it is determined that the debt is the result of economic abuse," this law purports to require the CRA to "remove any references to the debt or any portion of the debt determined to be the result of economic abuse from the consumer's credit report."  *Id.* § 1310-H(2-A).

41.     CDIA filed this lawsuit to challenge the original Medical Debt Provision and the Economic Abuse Provision, arguing that the FCRA preempts these state laws.

42.     While this lawsuit was pending, Maine drastically expanded its restrictions on medical debt reporting to impose a complete ban on including medical debt in consumer reports. On September 26, 2019, the Maine Legislature enacted L.D. 558, entitled "An Act to Strengthen Consumer Protections by Prohibiting the Report of Medical Debt on Consumer Reports," which became effective on September 24, 2025.

43.    This law—referred to herein as the Medical Debt Ban—amended Me. Rev. Stat. tit. 10 § 1310-H(4) to transform it from a restriction on reporting certain medical debt for a certain amount of time into an outright ban on reporting medical debt of any kind, still emphasizing that the law is intended to apply "[n]otwithstanding any provision of federal law."  Me. Rev. Stat. Ann. tit. § 1310-H(4)(A) (2025).  In addition, the Medical Debt Ban prohibits any "medical creditor, debt collector or debt buyer" from "report[ing] a consumer's medical debt to a consumer reporting agency."

44.    A person or company that fails to comply with the Medical Debt Ban, including CRAs and furnishers that fail to comply with the Medical Debt Ban or the Economic Abuse Provision, may be subjected to severe penalties under the law for such noncompliance, including:

A.    Investigation and administrative enforcement actions by Defendant Conti, Me. Rev. Stat. Ann. § 1310-A(2)-(3);

B.    Civil actions brought by Defendant Frey for a civil penalty of up to $5,000, *id.* § 1310-A(5); and

C.    Civil liability through private action by consumers, allowing for actual and treble damages and attorney's fees and costs to be recovered for willful violations, *id.* § 1310-C, or actual and additional damages of not less than $100 and attorney's fees and costs for negligent violations, *id.* § 1310-D.

45.    Defendants have stated their intent to enforce the Medical Debt Ban and the Economic Abuse Provision.  Although Defendants previously agreed to stay enforcement of the original Medical Debt Provision while CDIA's lawsuit challenging that law was pending, Defendants have now taken the position that the prior agreement does not apply to CDIA's

12

challenge to the new Medical Debt Ban, and have represented that they will take steps to implement and enforce the law immediately.

46.     Plaintiffs and/or their members are harmed by the Medical Debt Ban and the Economic Abuse Provision, and will continue to be harmed by its enforcement.

47.     By imposing onerous restrictions and prohibitions on consumer reporting and furnishing, Maine silences truthful speech by hiding a valuable and important category of credit information.  Maine has forced CRAs and furnishers—including CDIA's members and The Thomas Agency—to undertake the burden of developing, implementing, and maintaining regulatory compliance procedures for consumer reports issued in Maine that are separate and distinct from the procedures used for reports issued elsewhere and historically in Maine.

48.     The Medical Debt Ban and Economic Abuse Provision have forced CDIA's members and The Thomas Agency to make material changes to their day-to-day business operations to comply with the Maine FCRA and cease reporting or furnishing information that they have historically reported or furnished in full compliance with the FCRA.

49.     The Economic Abuse Provision, in particular, requires CDIA's CRA members to not only reinvestigate whether information that they have reported was accurately and completely reported by the furnisher (which all consumer reporting agencies must do per the FCRA, 15 U.S.C. § 1681i), but also to adjudicate whether an account was the result of "economic abuse" of the consumer, thereby impacting the creditor and the consumers' rights.  The Economic Abuse Provision prohibits the CRA from including that information in its reports if it determines (without any guidance on how to do so) that economic abuse did in fact occur.  Even if Maine had provided guidance, CRAs are not in a position to adjudicate such claims, and lack sufficient knowledge and expertise to do so. Further, to the extent that these adjudications are treated as FCRA disputes

13

under 15 U.S.C. § 1681i, which generally require the CRAs to convey the dispute and all relevant information associated therewith to the furnishers as part of a reinvestigation, the Economic Abuse Provision will impact the volume and complexity of an already high dispute volume, and which the furnishers are equally unsuited to adjudicate.

50.    CDIA's members and The Thomas Agency have expended and will continue to expend significant time and resources implementing these Maine-specific business changes and the procedures required to comply with the Medical Debt Ban and Economic Abuse Provision.

51.    Those required business changes have imposed a higher cost of doing business in Maine.  For instance, to comply with these laws, CDIA's CRA members are now required to implement procedures to (1) identify information already maintained in their databases that is or may be prohibited by the Maine FCRA, though not prohibited by the federal FCRA, and (2) prevent the inclusion of such data in reports issued in Maine, unlike reports issued elsewhere. Similarly, The Thomas Agency and other medical debt furnishers are now required to implement procedures to identify and prevent the furnishing of such information.

52.    The burden and cost of those measures have resulted in higher transaction costs for the multitude of industries that rely upon consumer reporting, higher credit application costs or interest charges to consumers, and a reduction in access to credit for consumers.  As noted by an expert's analysis of a similar medical debt reporting ban, this prohibition will have a significant cost impact on medical debt collection agencies, medical providers that rely on them, and ultimately consumers.  *See* Nigrinis Report ¶¶ 106-16.

53.    Taking a broader view, Maine's prohibitions on reporting or furnishing medical debt information 1) disrupt the nationwide consumer reporting system that Congress sought to ensure through the FCRA and 2) stifle lawful commercial speech, thereby inhibiting those that rely

14

upon consumer reports from investigating and evaluating consumers' credit standing using the information deemed relevant for this purpose by Congress.

## THE FEDERAL FAIR CREDIT REPORTING ACT AND ITS REQUIREMENTS

54.     Congress enacted the FCRA in 1970, finding that crucial sectors of the U.S. economy—including the banking system—are "dependent upon" consumer reporting, which promotes the efficiency of those sectors, and that "public confidence" in consumer reporting "is essential to the continued functioning" of those sectors.  *See* 15 U.S.C. § 1681(a)(1).

55.     Members of Congress have described the consumer reporting system as a "national delivery system" which, "like our national interstate highway system, like our national power grid, like our national communications system, . . . deliver[s] an incredible amount of value and [is] very important to the economy."  *Hearing Before the Comm. on Financial Services*, 108th Cong. 5-6 (2003) (statement of Spencer Bachus, U.S. Representative for the State of Alabama).

56.     In enacting the FCRA, Congress recognized that an "elaborate mechanism has been developed" by private market participants "for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers."  15 U.S.C. § 1681(a)(2).

57.     Congress enacted the FCRA to accomplish, among other things, its important goal of creating a uniform national standard for regulating the content of consumer reports—a standard that would allow the industry-developed system for investigating and evaluating credit determinations to continue meeting the needs of commerce, while still ensuring fair and equitable treatment for consumers.  To do so, Congress engaged in the rigorous task of balancing these dual interests by specifying standards with regard to certain specific aspects of consumer reporting. These standards were comprised of the rules enumerated within the FCRA and certain State laws in existence at the time the preemption provisions were enacted, which were grandfathered and

15

exempted from preemption. *See e.g.* 15 U.S.C. § 1681t(b)(1)(E) ("…except that this subparagraph shall not apply to any State law in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996").

58. One of the areas of consumer reporting that the FCRA specifically addresses is the content of consumer reports, meaning the information that can and cannot be included on a consumer report.

59. Congress's careful decisions about the content of consumer reports are codified in 15 U.S.C. § 1681c, entitled "Requirements relating to information contained in consumer reports."

60. Section 1681c(a) delineates the "[i]nformation excluded from consumer reports," and instructs that CRAs are generally prohibited from "mak[ing] any consumer report containing" certain enumerated "items of information."

61. The "items of information" that Congress has chosen to ban from consumer reports under Section 1681c include, among other items: adverse items of information (other than criminal convictions) that antedate the report by more than seven years; certain identifying information of medical information furnishers, unless reported using specially designed codes or for specific purposes; and certain types of medical debt belonging to a veteran. *Id.* §§ 1681c(a)(5)-(8). Congress also included in Section 1681c a requirement that CRAs include certain information in consumer reports, including information related to bankruptcies or whether a consumer has disputed an account. *Id.* §§ 1681c(d)–(f).

62. Most relevant here, in weighing the multitude of policy considerations and after balancing the dual interests of promoting effective consumer reporting and consumer protection, Congress (1) chose not to prohibit the reporting of non-veteran medical debt that does not antedate the report by more than seven years, and (2) chose not to prohibit the reporting of any debt,

16

including debt resulting from economic abuse, that does not antedate the report by more than seven years.

63.    For over 25 years, the FCRA did not specifically address medical debt information. That changed in 1996, when Congress amended the statute to prohibit CRAs from reporting a consumer's medical information without the consumer's consent. Economic Growth and Regulatory Paperwork Reduction Act of 1996 (Title II of Omnibus Consolidated Appropriations Act, 1997), Pub. L. No. 104-208, subtit. D, ch. 1, § 2405, 110 Stat. 3009–394 (codified at 15 U.S.C. § 1681b(g) (2000)).

64.    Congress revisited this issue in 2003 through the Fair and Accurate Credit Transactions Act ("FACTA").  Pub. L. No. 108-159, 117 Stat. 1952 (codified at 15 U.S.C. §§ 681–1681x (2003) ("FACTA")).  While maintaining the general restriction on the dissemination and use of consumers' medical information, Congress created a narrow exception: CRAs and creditors could utilize coded financial information related to medical debts.  15 U.S.C. §§ 1681b(g)(1)–(2). This adjustment reflected a deliberate balance—protecting sensitive health details while preserving the integrity and completeness of consumer reporting.  For example, Representative Sue Kelly noted at a hearing of the House Committee on Financial Services that she planned to propose statutory language "that will protect medical information of individuals without disrupting the access to low cost credit and the security of information." Fair and Accurate Credit Transactions Act of 2003: Hearings on H.R. 2622 Before the Comm. on Fin. Servs. 15 (2003). She went on to give a more concrete example:

> In New York City we have a wonderful cancer-treating institution called Memorial Sloan-Kettering. If I am being treated and I have a bill dispute with Memorial Sloan-Kettering, the assumption would be that I am being treated for cancer and the assumption is in many people's mind still that cancer is almost inevitably problematic to the extent that it deeply affects your ability to work or can result and does result in death. My concern is if that name, like Memorial Sloan-

17

Kettering, appears on a credit report, there may be an assumption made by someone who is looking at that credit report that I have a difficulty without understanding that I am there because I am actually going back in for a checkup and there was a discussion about that bill. I want to make sure that we work out a method so that the financial end of that could be presented, but the entity providing that service is not listed. That is my intent, that is the legislation that I am working on, and I am glad to think that you would be working with me on that.

65.     Following those amendments, the FCRA now addresses medical information in five separate statutory sections, including (1) in Section 1681a, where it appears within several definitions; (2) in Section 1681b, where it is addressed in two interrelated provisions governing how CRAs may report and how creditors may use medical information; (3) in Section 1681c, where restrictions are placed on the reporting of veterans' medical debt; (4) in Section 1681i, where a dispute process is provided specifically for disputes with respect to a veteran's medical debt; and (5) in Section 1681s-2, where medical debt furnishers are required to notify CRAs of their status as a medical information provider.

66.     In particular, Section 1681b's provisions addressing the permissible uses of medical debt information for consumer reporting are divided into two subsections: one governing the conduct of CRAs and the other regulating creditors.

67.     First, the statute recognizes that CRAs may furnish information about medical debt, provided that the information is reported in a manner that does not reveal the identity of the medical provider or disclose the nature of the underlying condition:

> A consumer reporting agency **shall not** furnish for employment purposes, or in connection with a credit or insurance transaction, a consumer report that contains medical information (other than medical contact information treated in the manner required under section 1681c(a)(6) of this title) about a consumer, **unless**. . . the information to be furnished pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services, products, or devices, **where such information, other than account status or amounts, is restricted or reported using codes that do not identify, or do not provide information sufficient to infer, the specific provider or the nature of such services, products, or devices, as provided in section 1681c(a)(6) of this title.**

18

*Id.* § 1681b(g)(1) (emphases added).

68.    Section 1681c(a)(6) further prescribes how the name, address, and telephone number of a medical information furnisher must be coded to ensure that the codes "do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer."

69.    Second, FACTA added a corresponding provision for creditors, allowing them to use medical debt information in credit decisions when the information is properly coded:

> Except as permitted pursuant to paragraph (3)(C) or regulations prescribed under paragraph (5)(A), a creditor shall not obtain or use medical information (**other than medical information treated in the manner required under section 1681c(a)(6) of this title**) pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit.

*Id.* § 1681b(g)(2) (emphasis added).

70.    By expressly allowing the reporting and use of medical debt under specific conditions, and by not imposing requirements upon CRAs to investigate and make determinations regarding whether a debt has resulted from "economic abuse," Congress struck a careful balance between consumer privacy and the integrity of the national consumer reporting system.  That balance reflects a uniform federal standard for the entire country—one that leaves no room for conflicting state laws that would prohibit what federal law permits.

## FEDERAL PREEMPTION AND THE FCRA

71.    The Supremacy Clause of the U.S. Constitution provides that "the laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const. art. VI, ¶ 2.

72.    Under the Supremacy Clause, federal law preempts a state law if it "is impossible to comply with both state and federal law . . . *or* where the state law stands as an obstacle to the

19

accomplishment of the full purposes and objectives of Congress." *Wood v. Gen. Motors Corp.*, 865 F.3d 395, 401 (1st Cir. 1988) (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988) (emphasis added)); *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) ("Obstacle preemption is implicated when 'the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."'").

73.    Congress expressly exercised its authority to preempt State law in Section 625 of the FCRA, codified at 15 U.S.C. § 1681t, entitled "Relation to State laws."

74.    Since it was first enacted in 1970, the FCRA has preempted state laws that are "inconsistent with any provision of" the FCRA, "to the extent of the inconsistency." *Id.* at 1681t(a).

75.    In 1996, Congress went further, undertaking a comprehensive overhaul of the FCRA. Part of this overhaul included substantially expanding the FCRA's regulation of what can and cannot appear on a consumer report. Pub. L. No. 104-208, tit. II, subtit. D, § 2406(e), 110 Stat. 3009-434–35 (1996). Another part of the overhaul included Congress expressly preempting vast swaths of state law that related to specific subject matters already comprehensively regulated under the FCRA. Pub. L. 104-208, Sec. 2419, 110 Stat. 3009–452-53 (codified at 15 U.S.C. § 1681t(b)).[2] Congress specifically identified the FCRA sections in which its careful balancing of marketplace needs with consumer protection must not and cannot be interfered with by the States. Any attempted regulatory action by the States within those defined spaces is preempted.

---

[2] As originally enacted, the FCRA's subject matter preemption provisions would have expired on January 1, 2004. *See* 110 Stat. 3009-453. In 2003, however, Congress eliminated that sunset provision, FACT Act, Pub. L. 108-159, tit. VII, § 711, 117 Stat. 2011, in order to make § 1681t(b)'s national standards "permanent" and "preclude states" from creating additional requirements that would disrupt the "efficient operation" of national credit markets. S. Rep. No. 108-166, at 11, 25.

76. Recognizing the plain meaning of the FCRA's express language and the legislative history detailed above, the Consumer Financial Protection Bureau ("CFPB"), the regulatory agency tasked with rulemaking authority over the FCRA, recently issued an interpretive rule that affirms the FCRA's broad preemption of state laws seeking regulate the content of consumer reports. Fair Credit Reporting Act; Preemption of State Laws, 90 Fed. Reg. 48,710 (Oct. 28, 2025) (to be codified at 12 C.F.R. pt. 1022).

77. Included among those enumerated subject matters is "information contained in consumer reports," which Congress addressed in Section 605 of the FCRA, 15 U.S.C. § 1681c. Specifically, the FCRA states: "No requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681c of this title, relating to information contained in consumer reports . . . ." *Id.* § 1681t(b)(1)(E).[3]

78. As the name implies, Section 1681c regulates "information contained in consumer reports." Among other things, Section 1681c(a) regulates the reporting of adverse consumer information, and in particular, subsection 1681c(a)(5) prohibits reporting any adverse information antedating the report by more than seven years. 15 U.S.C. § 1681c(a)(5). Medical debt is one form of adverse information.

79. Subsection 1681c(a)(6) also specifically regulates the reporting of medical information, by prohibiting nationwide CRAs from reporting certain veterans' medical debt. *Id.* § 1681c(a)(7)-(8).

---

[3] In a prior appeal in the present case, the First Circuit rejected the argument that Section 1681t(b)(1)(E) broadly preempts all state laws "relating to" the subject matter of the information contained in consumer reports, instead holding that Section 1681t(b)(1)(E) more narrowly preempts only laws that impose requirements with respect to the specific kinds of information regulated under Section 1681c(a). *CDIA v. Frey*, 26 F.4th 1, 14 (1st Cir. 2022) ("*Frey I*").

80. Further, subsections 1681c(a)(7) and (8) specifically regulate the reporting of medical debt information by only prohibiting the reporting of medical debt if it belongs to a veteran. *Id.* § 1681c(a)(7)-(8).

81. But 1681c also imposes other requirements, including mandatory reporting of certain bankruptcy information, and indicating whether a consumer disputes a specific item on a credit report. 15 U.S.C. § 1681c(d).

82. The medical debt and economic-abuse-related debt information that Maine has sought to prohibit from consumer reports are, therefore, "subject matters . . . relating to information contained in consumer reports" that are regulated by multiple subsections of Section 1681c(a).

83. The FCRA also expressly preempts the "subject matter" of "the responsibilities of persons who furnish information to consumer reporting agencies," which Congress addressed in Section 623 of the FCRA, 15 U.S.C. § 1681s-2. Specifically, the FCRA states: "No requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . ." *Id.* § 1681t(b)(1)(F).

84. By implementing a total ban on CRAs' reporting of medical debt in consumer reports and furnisher's furnishing of medical debt to CRAs, Maine's Medical Debt Ban intrudes upon preempted subject matters of both adverse items of information and medical debt information.

85. Similarly, Maine's Economic Abuse Provision is preempted because it requires the removal of adverse information that was the result of economic abuse, which is a subject matter reserved exclusively for federal regulation. *Id.* § 1681t(b)(1)(E).

22

86.     Maine's Economic Abuse Provision is also preempted under the conduct preemption provisions of the FCRA, because it purports to regulate the conduct of CRAs in responding to consumer's claims that reported information resulted from economic abuse.  Those requirements interfere with the requirements that Section 1681c-2 of the FCRA places upon CRAs once they receive notice from a consumer that information included in their consumer report was the result of identity theft or fraud.  A consumer's claim of identity theft or fraud would fall within the scope of a claim of economic abuse; yet, Maine's Economic Abuse Provision imposes different response requirements on the CRA upon receipt of such a claim than those imposed by the FCRA under 15 U.S.C. § 1681c-2.  Accordingly, Maine's Economic Abuse Provision impermissibly seeks to impose "requirement[s] . . . with respect to the conduct required by the specific provisions of . . . section 1681c-2" of the FCRA, and thus is preempted.  15 U.S.C. § 1681t(b)(5)(C).

87.     Moreover, even under Section 1681t(a)'s general "inconsistency" preemption provision, the Medical Debt Ban and Economic Abuse Provision are preempted.

88.     Congress enacted the "inconsistency" preemption provision found in Section 1681t(a) against the backdrop of a well-developed federal common law doctrine of "obstacle" preemption, which provides that a state law which "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" is implicitly preempted.  *Pub. Interest Legal Found., Inc. v. Bellows*, 92 F.4th 36, 52 (1st Cir. 2024).

89.     Maine's effort to impose state-specific bans on reporting certain types of information is inconsistent with the FCRA's fundamental purpose, which is to achieve a uniform, nationwide standard for regulating consumer reporting—in particular, a uniform standard regarding what kinds of information may be reported in a consumer report and for how long.

90.     The Medical Debt Ban and Economic Abuse Provision are also inconsistent with specific provisions of the FCRA that impose requirements for reporting medical debt and adverse items of consumer information, or furnishing such information to a CRA.  *See, e.g.*, 15 U.S.C. § 1681b(g).  Indeed, a federal court recently held that "any state law purporting to prohibit a CRA from furnishing a credit report with coded medical information [including medical debt information] would be inconsistent with FCRA and therefore preempted."  *Cornerstone Credit Union League v. CFPB*, No. 4:25-CV-16, 2025 WL 1920148, at *12 (E.D. Tex. July 11, 2025).

91.     Allowing Maine (or other States) to impose divergent, state-specific requirements on consumer reporting that are different than what the FCRA requires would impose significant burdens on consumer reporting agencies operating across state lines, as it would require them to prepare fundamentally different consumer reports depending on the jurisdiction in which their customers are located.  It would also impose significant burdens on furnishers and users of consumer reports, by requiring them to employ different practices for furnishing information and assessing consumers' creditworthiness in different states.  Those burdens would undermine the efficacy and usefulness of the national consumer reporting industry, and thus contradict Congress's intent of creating a uniform system for consumer reporting.

## THE FIRST AMENDMENT AND CREDIT FURNISHING/REPORTING

92.     Consumer reports have been recognized as a form of commercial speech that qualifies for protection under the First Amendment.  *See, e.g.*, *Yim v. City of Seattle*, 63 F.4th 783, 801 (9th Cir. 2023).

93.     When a law seeks to place restrictions on truthful commercial speech, it must withstand "intermediate scrutiny" under the test set forth by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Serv. Commission of New York*, 447 U.S. 557 (1980).

94.     The *Central Hudson* test requires that where, as here, the speech in question is not false, deceptive, or misleading, then a law restricting that speech is only permissible if it "directly and materially advances a substantial state interest in a manner no more extensive than necessary to serve that interest." *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011) (applying *Central Hudson* test to hold law imposing content-based restriction on commercial speech that did not directly and materially advance state's substantial interest in a manner no more extensive than necessary to serve that interest was unconstitutional).  In other words, a court must balance the importance of the state interest against the severity and extent of the restriction.  *See id.*

95.     The Medical Debt Ban fails *Central Hudson*'s balancing test. Unlike the FCRA's carefully tailored limitations on reporting some adverse information, the Medical Debt Ban's blunderbuss, content-based ban on communicating information about medical debt (by furnishers and CRAs alike) places significant burdens upon both speakers and listeners of such speech, while not directly advancing any substantial state interest.

96.     First, the Medical Debt Ban is indisputably a "complete suppression of speech ordinarily protected by the First Amendment."  *Central Hudson*, 447 U.S. at 569–70.  By prohibiting furnishers and CRAs from communicating regarding medical debt, the Medical Debt Ban restricts commercial speech that "concern[s] lawful activity" and is not "misleading," and therefore is speech that is "protected by the First Amendment."  *Id.* at 566.

97.     Second, the Medical Debt Ban fails to advance directly a substantial government interest.  The "link between the [Medical Debt Ban] and [that interest] is, at most, tenuous."  *Id.* at 559.

98.     In particular, the Medical Debt Ban targets only the inclusion of medical debt information in consumer reports by furnishers and CRAs.  It does not expunge the debt, nor does

25

it prevent medical debt from being collected, enforced, or spoken about in any context or through any means other than consumer reports, or by any entities other than credit furnishers and CRAs. At best, it "provides only ineffective or remote support for the government's purpose,'" which is insufficient to justify "[a] restriction against commercial speech." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (citation omitted).

99.     Third, the law is also "more extensive than is necessary to serve" any asserted governmental interest.  This tailoring requirement demands a tight fit between the purported state interest and the means chosen to further that interest.  In other words, there must be a "reasonable fit between the legislature's ends and the means chosen to accomplish those ends." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 528 (2001).

100.     Because the Medical Debt Ban enacts an outright ban on communicating an entire category of legitimately owed debt, it is more extensive than necessary to serve whatever interest the State may proffer.

101.     The Medical Debt Ban is notably overinclusive.  It does not account for the circumstances of the debt or the consumer, instead indiscriminately sweeping all medical debt into its ambit.  *Carey v. Wolnitzek*, 614 F.3d 189, 205 (6th Cir. 2010) (identifying narrow-tailoring problem where statutory definition of "solicitation" encompassed "methods of solicitation" that "present little or no risk" of implicating the purported state interest).

102.     The Medical Debt Ban has the effect of creating barriers and disincentives to the extension of credit in the medical arena by making such debts unreportable and uncollectable. Specifically, by prohibiting furnishers from furnishing such truthful information to CRAs and prohibiting CRAs from including that information in their consumer reports, the law essentially prevents enforcement and collection of an entire category of legitimately owed debt.

26

103. Furthermore, users of consumer reports seek those reports so that they may obtain a full, accurate understanding of a consumer's credit profile and capacity. By eliminating communication about an entire category of legitimately owed debt, consumer reports are rendered less accurate and less trustworthy, forcing users to make credit decisions blindly or seek other methods for assessing eligibility.

104. Additionally, less restrictive alternatives to serve the same consumer protection interest exist—indeed, they are already in place nationally. The FCRA already serves the State's interest in protecting consumers by limiting CRAs' ability to report adverse consumer information of nearly all kinds—including medical debt—by more than seven years. It also creates robust processes for consumers to dispute the accuracy of items on their reports, including items related to medical debt.

105. The Maine Legislature has also demonstrated that less restrictive alternatives exist, in that it originally enacted a less restrictive (although still preempted) regulation on reporting certain types of medical debt for a certain amount of time, only to now replace that law with a much more restrictive total ban on communicating medical debt.

106. "When," as here, "plausible, less restrictive alternative[s] [are] offered to a content-based restriction, it is the Government's obligation to prove that the alternative [would] be ineffective to achieve its goals." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). Maine cannot do so here.

107. Plaintiffs and their members in particular are harmed—as both speakers and listeners—by this restriction of speech. Unreported debts, medical or otherwise, are less likely to be collected, which directly reduces the revenues of The Thomas Agency and other medical debt furnishers. Furthermore, the forced incompleteness and reduced reliability of the consumer reports

27

that CDIA's members must issue in Maine will drive their customers to seek other methods for assessing credit eligibility, directly reducing the revenues of CDIA's members.

108. Moreover, the loss of a constitutional right, alone, is an injury that warrants redress by the courts. The "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, (1976).

109. CDIA's members have a First Amendment right to communicate, and credit providers have a First Amendment right to receive, protected commercial speech. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 756 (1976).

110. CDIA and the Thomas Agency have a right to speak and receive truthful commercial speech. This right is violated each day that they cannot share or receive banned speech.

111. Additionally, an injunction against enforcement of the Medical Debt Ban will serve the public interest, as "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012).

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**
**Declaratory Relief**
**(Federal Preemption)**
**28 U.S.C. §§ 2201, 2202; U.S. CONST. art. VI, cl. 2.**

112. Plaintiffs incorporate by reference the preceding paragraphs as if fully restated herein.

113. Plaintiffs and Defendants have fundamental disagreements regarding the interpretation and application of 15 U.S.C. §§ 1681c and 1681t, the Medical Debt Ban, and the Economic Abuse Provision.

28

114. The Medical Debt Ban and the Economic Abuse Provision purport to prohibit furnishing and reporting consumer information that is expressly permitted by the federal FCRA.

115. Those prohibitions improperly seek to regulate the information contained in consumer reports, a subject matter regulated under 15 U.S.C. § 1681c, and the obligations and responsibilities of furnishers, a subject matter regulated under 15 U.S.C. § 1681s-2. Accordingly, those provisions of the Maine FCRA are expressly preempted by the FCRA under 15 U.S.C. §§ 1681t(b)(1)(E) and 1681t(b)(1)(F).

116. No matter how narrowly the court defines FCRA preemption, the information regulated by the Medical Debt Ban and the Economic Abuse Provision is specifically regulated by at least two parts of Section 1681c—adverse items of information and medical information.

117. Those prohibitions are also inconsistent with the requirements, provisions, and purpose of the FCRA in establishing a uniform nationwide standard for the consumer reporting system. *See, e.g.*, 15 U.S.C. § 1681b(g). Thus, those provisions of the Maine FCRA are expressly preempted by the FCRA under the express "inconsistency" provision in 15 U.S.C. § 1681t(a).

118. Finally, Maine's prohibitions stand as an obstacle to accomplishing Congress's objectives in passing the FCRA, including Congress's goal to provide for a uniform national standard of regulation for the consumer reporting system. As such, those provisions of the Maine FCRA are implicitly preempted by the federal FCRA (in addition to the express preemption under Sections 1681t(b)(1)(E) and 1681t(a)). *Maine Forest Prods. Council*, 51 F.4th at 6.

119. As noted above, the Defendants have stated their intent to enforce fully the Medical Debt Ban and the Economic Abuse Provision.

120. The Medical Debt Ban's and the Economic Abuse Provision's prohibitions will harm CDIA's CRA members by impeding their ability to report accurate and predictive data relied

upon by their customers for credit underwriting and other legitimate purposes. Creditors' inability to accurately assess credit risk will result in increased delinquencies and potentially increase the cost, and decrease the availability, of consumer credit.

121. These laws will also force CDIA's members and The Thomas Agency to make material changes to their day-to-day business operations to cease reporting or furnishing information that they have historically reported or furnished in full compliance with the FCRA. Those required business changes will impose a higher cost of doing business in Maine, and will require significant expenditures of time and resources.

122. The interests CDIA seeks to protect in this action are central to its organizational mission. CDIA's members will suffer immediate and irreparable harm if they are forced to comply with a state law that is preempted by the FCRA. The Court's favorable determination concerning the federal preemption challenges presented in this Complaint will prevent this harm.

123. Because Plaintiffs and/or their members are subject to the prohibitions set forth in the Medical Debt Ban and the Economic Abuse Provision, and must either make material operational changes to comply with the Medical Debt Ban and Economic Abuse Provision or expose themselves to a substantial threat of enforcement by Defendants, there is an actual controversy over which this Court has jurisdiction to award declaratory and injunction relief under 28 U.S.C. §§ 2201 *et seq*.

124. Plaintiffs and/or their members are entitled to a declaratory judgment that the Medical Debt Ban and the Economic Abuse Provision are preempted by federal law.

125. Plaintiffs and/or their members are entitled to entry of injunctive relief prohibiting Defendants from enforcing the Medical Debt Ban and the Economic Abuse Provision, because they are preempted by the FCRA.

**COUNT II**
**Violation of Freedom of Speech**
**(Content-Based Restriction on Speech)**
**42 U.S.C. § 1983; U.S. CONST. amends. I, XIV**

126.   Plaintiffs incorporate by reference the preceding paragraphs as if fully restated herein.

127.   42 U.S.C. § 1983 provides a civil right of action against any person who, under color of state law, deprives any person of the rights, privileges, or immunities secured by the Constitution and laws of the United States.

128.   Defendants have been charged with enforcing the Medical Debt Ban and, as such, are acting under color of state law within the meaning of 42 U.S.C. § 1983.

129.   Plaintiffs and Defendants have fundamental disagreements regarding the constitutionality of the Medical Debt Ban.

130.   The Medical Debt Ban purports to restrict truthful, non-misleading commercial speech without directly and materially advancing a substantial state interest in a manner no more extensive than necessary to serve that interest, and therefore intrudes upon Plaintiffs' federally protected right of free speech guaranteed under the First Amendment of the U.S. Constitution. *Central Hudson*, 447 U.S. 557.   The First Amendment's guarantee of freedom of speech is incorporated against the States, including the State of Maine, through the Due Process Clause of the Fourteenth Amendment.  *Manhattan Comm. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019).

131.   The content-based speech restrictions imposed by the Medical Debt Ban will harm Plaintiffs and their members by impeding their ability to communicate and receive truthful, non-misleading information that is relied upon by numerous commercial industries.  Creditors' inability

31

to accurately assess credit risk will result in increased delinquencies and potentially increase the cost, and decrease the availability, of consumer credit.

132.    This law will force CDIA's members and The Thomas Agency to make material changes to their day-to-day business operations to cease communicating medical debt information and to operate their businesses without receiving such information regarding Maine consumers. Those required business changes will impose a higher cost of doing business in Maine and require significant expenditures of time and resources.

133.    The interests CDIA seeks to protect in this action are central to its organizational mission.  CDIA's members will suffer immediate and irreparable harm if they are forced to comply with a state law that restricts their constitutionally protected commercial speech.  The Court's favorable determination concerning the First Amendment issue presented in this Complaint will prevent this harm.

134.    Because Plaintiffs and/or their members are subject to the prohibitions set forth in the Medical Debt Provision and must either make material operational changes to comply with the Medical Debt Provision or expose themselves to a substantial threat of enforcement by Defendants, there is an actual controversy over which this Court has jurisdiction to award declaratory and injunction relief under 28 U.S.C. §§ 2201 *et seq*.

135.    Plaintiffs and/or their members are entitled to a declaratory judgment that the Medical Debt Provision and the Economic Abuse Provision are unconstitutional under the First Amendment's guarantee of free speech.

136.    Plaintiffs and/or their members are entitled to entry of injunctive relief prohibiting Defendants from enforcing the Medical Debt Provision as an unconstitutional abridgement of free speech under the First Amendment.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs Consumer Data Industry Association and The Thomas Agency respectfully request the following relief:

A.      Declaratory judgment, pursuant to 28 U.S.C. § 2201, that Me. Rev. Stat. Ann. tit. 10, § 1310-H(2-A) is preempted by the federal Fair Credit Reporting Act;

B.      Declaratory judgment, pursuant to 28 U.S.C. § 2201, that Me. Rev. Stat. Ann. tit. 10, § 1310-H(4) is preempted by the federal Fair Credit Reporting Act;

C.      Declaratory judgment, pursuant to 28 U.S.C. § 2201, that Me. Rev. Stat. Ann. tit. 10, § 1310-H(4) is unconstitutional under the First Amendment to the U.S. Constitution;

D.      An order preventing Defendant from enforcing Me. Rev. Stat. Ann. tit. 10, § 1310-H(2-A);

E.      An order preventing Defendant from enforcing Me. Rev. Stat. Ann. tit. 10, § 1310-H(4);

F.      An order awarding Plaintiffs the cost incurred in pursuing this action, including reasonable attorney's fees, as allowable pursuant to 42 U.S.C. § 1988(b) and/or any other provision of law; and

G.      Such other and further relief as the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted, this 23rd day of December, 2025.

/s/ David N. Anthony
David N. Anthony (admitted *pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-5410

33

Facsimile: (804) 698-5118
Email: david.anthony@troutman.com

Misha Tseytlin (admitted *pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Drive
Suite 4100
Chicago, IL 60606
Telephone: (312) 759-5947
Facsimile: (312) 759-1939
Email: misha.tseytlin@troutman.com

Jennifer L. Sarvadi (admitted *pro hac vice*)
Rebecca E. Kuehn (admitted *pro hac vice*)
HUDSON COOK LLP
1909 K. Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 715-2002
Email:  jsarvadi@hudco.com
Email: rkuehn@hudco.com

Micah A. Smart
MURRAY PLUMB & MURRAY
75 Pearl Street
P.O. Box 9785
Portland, ME 04104
Telephone: (207) 699-0052
Email: msmart@mpmlaw.com

*Attorneys for Plaintiff Consumer Data Industry Association*

*/s/ David N. Anthony*
David N. Anthony (admitted *pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutman.com

Misha Tseytlin (admitted *pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Drive
Suite 4100
Chicago, IL 60606

34

Telephone: (312) 759-5947
Facsimile: (312) 759-1939
Email: misha.tseytlin@troutman.com

*Attorneys for Plaintiff The Thomas Agency, Inc.*

35