**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| CONSUMER DATA INDUSTRY ASSOCIATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>AARON M. FREY, in his official capacity as the Attorney General of the State of Maine, *et al.*,<br><br>Defendants. | CIVIL ACTION NO.: 1:19-cv-00438-LEW |

**DEFENDANTS' MOTION TO DISMISS COUNT I**

Twice already the Consumer Data Industry Association ("CDIA") has asked federal courts to conclude that the Fair Credit Reporting Act ("FCRA") preempts Maine's efforts to shield survivors of economic abuse and those suffering from onerous medical debts from the compounding consequences of unfair credit reporting. And twice already CDIA has been told "no." After the First Circuit turned away CDIA's facial challenge to the Maine statutes at issue, this Court on remand carefully analyzed CDIA's partial preemption arguments under FCRA. And aside from two discrete areas related to the reporting of veterans' medical debt and identity theft , which Defendants accept as law of the case, this Court rejected CDIA's theories.

Now CDIA returns with a co-plaintiff and an Amended Complaint. Setting aside the new First Amendment claims under Count II, the Amended Complaint injects no new factual allegations or legal theories that would alter this Court's prior analysis regarding FCRA preemption under Count I. Accordingly, this Court should not entertain Plaintiffs' invitation to treat the past seven years of litigation as an Etch-A-Sketch. Instead, it should apply the law of the case and its prior legal analysis to narrow the scope of what actually remains in dispute.

For this reason, as detailed in the incorporated memorandum of law below, Defendants Attorney General Frey and Superintendent Conti respectfully request that the Court dismiss Count I—to the extent that doing so does not conflict with law of the case regarding identity theft and the reporting of veterans' medical debt.

**MEMORANDUM OF LAW**

**Statutory Background**

***Maine Law Relating to Reporting of Medical Debt***

In 2019, the 129th Maine Legislature enacted L.D. 110, "An Act Regarding Credit Ratings Related to Overdue Medical Expenses," which stated:

> Notwithstanding any provision of federal law, a consumer reporting agency shall comply with the following provisions with respect to the reporting of medical expenses on a consumer report.
>
> A. A consumer reporting agency may not report debt from medical expenses on a consumer's consumer report when the date of the first delinquency on the debt is less than 180 days prior to the date that the debt is reported.
>
> B. Upon the receipt of reasonable evidence from the consumer, creditor or debt collector that a debt from medical expenses has been settled in full or paid in full, a consumer reporting agency:
>
> (1) May not report that debt from medical expenses; and
>
> (2) Shall remove or suppress the report of that debt from medical expenses on the consumer's consumer report.
>
> C. As long as the consumer is making regular, scheduled periodic payments toward the debt from medical expenses reported to the consumer reporting agency as agreed upon by the consumer and medical provider, the consumer reporting agency shall report that debt from medical expenses on the consumer's consumer report in the same manner as debt related to a consumer credit transaction is reported.

10 M.R.S. § 1310-H(4).

The sponsor, Representative Chris Johansen, explained that the law's purpose was "to protect people from the ramifications of sometimes hard to avoid bad credit reports associated with medical bills. Medical bills are unique in that they are usually an unplanned for expense." *See*

Johansen Test., Feb. 12, 2019 (ECF 13-3, PageID 41); Cashman Test. (on behalf of Maine Association of Realtors), Feb. 12, 2019 (ECF 13-3, PageID 47) (stating that it is "unfair" for a consumer to be disqualified from financing because of medical debt that is being paid off "because medical debt is generally not indicative of poor personal financial management but rather, often, the result of catastrophic medical events").

Five years later, Maine opted to reinforce protections for its citizens facing medical debt, when the 131st Legislature enacted Me. Pub. L. 2025, ch. 201, "An Act to Strengthen Consumer Protections by Prohibiting the Reporting of Medical Debt on Consumer Reports." The Act amended 10 M.R.S. § 1310-H(4) to flatly prohibit consumer reporting agencies from reporting medical debt, eliminating the previous 180-day time-bar. Consistent with this flat prohibition, it also struck the provisions that had regulated the reporting of settled medical debts or those where consumers were making regular payments. *Id.* It further prohibits medical creditors, debt collectors, and debt buyers, which are defined in statute, from reporting consumer medical debt to consumer reporting agencies. *Id.* § 1310-H(4)(A).

Because this Motion discusses both the earlier and current versions of Maine's statute governing medical debt reporting, it will refer to the earlier version as Maine's "Medical Debt Restriction" and the current version as Maine's "Medical Debt Ban."

***Maine Law Relating to Reporting of Economic Abuse Debt***

In early 2019, when the Legislature was considering Maine's Medical Debt Restriction, it also enacted L.D. 748, "An Act to Provide Relief to Survivors of Economic Abuse." One aspect of L.D. 748 relates to consumer reports:

> Except as prohibited by federal law, if a consumer provides documentation to the consumer reporting agency as set forth in Title 14, section 6001, subsection 6, paragraph H that the debt or any portion of the debt is the result of economic abuse as defined in Title 19-A, section 4002, subsection 3-B, the consumer reporting

> agency shall reinvestigate the debt. If after the investigation it is determined that the debt is the result of economic abuse, the consumer reporting agency shall remove any reference to the debt or any portion of the debt determined to be the result of economic abuse from the consumer's credit report.

10 M.R.S. § 1310-H(2-A). "Economic abuse" is defined as:

> causing or attempting to cause an individual to be financially dependent by maintaining control over the individual's financial resources, including, but not limited to, unauthorized or coerced use of credit or property, withholding access to money or credit cards, forbidding attendance at school or employment, stealing from or defrauding of money or assets, exploiting the individual's resources for personal gain of the defendant or withholding physical resources such as food, clothing, necessary medications or shelter.

19-A M.R.S. § 4002(3-B).

The legislation's primary sponsor explained that one in four women and one in nine men experience domestic abuse, and that the vast majority of domestic abuse cases include economic abuse, stating that "[p]ower and control is at the root of domestic violence and controlling finances is another very effective way for an abuser to achieve that." Rep. Jessica Fay Test., April 3, 2019 (Document 13-4, PageID 50-51).

***The Federal Fair Credit Reporting Act ("FCRA")***

Recognizing that "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers," Congress enacted FCRA in 1970 to ensure "reasonable procedures for meeting the needs of commerce . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681. As originally enacted, FCRA had a savings clause broadly preserving State authority:

> This title does not annul, alter, affect, or exempt any person subject to the provisions of this title from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, except to the extent that those laws are inconsistent with any provision of this title, and then only to the extent of the inconsistency.

Pub. L. 91-508, § 622 (codified at former 15 U.S.C. § 1681(t)). The Consumer Credit Reporting Reform Act of 1996 amended this savings clause by carving out certain areas in which States would be precluded from regulating. The current version of the savings clause states:

> Except as provided in subsections (b) and (c), this subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, or for the prevention or mitigation of identity theft, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.

15 U.S.C. § 1681t(a). Therefore, unless a state law falls within one of the exceptions in subsections (b) and (c), it is preempted only to the extent it is inconsistent with FCRA. *See Stafford v. Cross Country Bank*, 262 F. Supp. 2d 776, 786 (W.D. Ky. 2003) (noting that "in § 1681t(a) Congress provided that states were free to enact laws regulating consumer credit reporting" and "then enumerated several exceptions"). State laws are "inconsistent" with FCRA provisions only when compliance would result in violation of FCRA.[1]

Section 1681t(b)(1) sets forth various exceptions to the general rule of non-preemption, and all of the provisions in subsections (b) and (c) follow a similar pattern. The section begins by stating that "[n]o requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under" various other sections of FCRA. 15 U.S.C. § 1681t(b)(1). Those sections are then listed out, along with a description of each section.

In each case, a specific FCRA provision is identified followed by a "relating to" clause providing a general description of the identified provision. For example, it lists "subsection (c) or

[1] *See Aghaeepour v. N. Leasing Sys., Inc.*, 378 F. Supp. 3d 254, 263 (S.D.N.Y. 2019) ("The Senate Report directly explains how this savings clause functions, providing that the phrase 'State laws which are inconsistent with Federal law are preempted to the extent [of] the inconsistency' means that 'no State law would be preempted unless compliance would involve a violation of Federal law.'" (citing S. Rep. No. 517, 91st Cong., 1st Sess. 8 (Nov. 5, 1969)).

(e) of section 1681b of this title, relating to the prescreening of consumer reports" and "subsections (a) and (b) of section 1681m of this title, relating to the duties of a person who takes any adverse action with respect to a consumer." 15 U.S.C. § 1681t(b)(1)(A), (C). It also includes matters "relating to information contained in consumer reports," specifically regulated under § 1681c.[2] *Id.* § 1681t(b)(1)(E).

**Procedural History**

On September 26, 2019, CDIA filed suit against the Maine Attorney General and the Superintendent of the Maine Bureau of Consumer Credit Protection, seeking a declaration that the two Maine Debt Reporting Acts are preempted by 15 U.S.C. § 1681t(b)(1)(E), as well as an injunction barring Defendants from enforcing the laws. (ECF 1). The parties agreed to resolve the matter via cross-motions for judgment on a stipulated record. (ECF 13). During briefing, CDIA made the additional argument that the Economic Abuse Debt Reporting Act is preempted by 15 U.S.C. § 1681t(b)(5)(C). (ECF 15, PageID 162-64).

On October 8, 2020, this Court entered an order granting CDIA's Motion for Judgment. (ECF 41). It concluded that § 1681t(b)(1)(E) preempts any state law that seeks to regulate information contained in consumer reports, regardless of whether the law addresses a subject matter regulated under § 1681c. *Id.* at 13-14. The Court also determined that because Section 1681c regulates the reporting of veterans' medical debt, it regulates medical debt generally. *Id.* at 14-15. In doing so, it concluded that both the Medical Debt Restriction and Economic Abuse Provision are preempted by § 1681t(b)(1)(E).

On appeal, the First Circuit vacated this Court's order, concluding that § 1681t(b)(1)(E) does not preempt all state laws regulating the content of consumer reports, but instead only those

[2] Notably, 15 U.S.C. § 1681c(a) designates matters that may not be included in consumer reports, while § 1681c(b) refers to subject matters that consumer credit reports are permitted to contain.

that relate to subject matter regulated under section 1681c. *Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 6-10 (1st Cir. 2022), cert. denied, 215 L. Ed. 2d 47, 143 S. Ct. 777 (2023). When examining the scope of § 1681c, the First Circuit noted that subject to three exceptions set forth in § 1681c(b), § 1681c(a)(1)-(5) regulates the reporting of various types of adverse information, such as bankruptcies, civil judgments, and accounts placed for collection, with a "catch-all" provision prohibiting the reporting of "[a]ny other adverse item of information, other than records of convictions of crimes[,] which antedates the report by more than seven years." *Id*. at 10-11. It explained that the "catch-all language is broad enough to cover medical debt and debt resulting from domestic abuse, which consist of adverse items of information not covered by the immediately preceding provisions," but that "[m]easuring the reach of preemption," the provision "points to age." *Id*. at 11.

Accordingly, the First Circuit held that neither the Medical Debt Restriction nor the Economic Abuse Provision were preempted in their entirety by § 1681t(b)(1)(E), without considering the specific provisions of § 1681c(a). *Id.* at 14. Because CDIA had "not developed any argument as to whether and how the [Debt Provisions] might trench on this more circumscribed 'subject matter'—i.e., the 'items of information' listed in Section 1681c(a)," the First Circuit remanded the issue to this Court. *Id.*

The First Circuit then considered—and rejected—CDIA's argument that because §§ 1681c(a)(7) and (8) regulate the reporting of veterans' medical debt, the provisions constitute the regulation of medical debt generally. It "conclude[d] that Sections 1681c(a)(7) and 1681c(a)(8) only regulate the reporting of veterans' medical debt, not medical debt in general." *Id.* at 12. It was therefore "clear" that "Sections 1681c(a)(7) and 1681c(a)(8) have no preemptive effect for non-veterans' medical debt." *Id.* It then demurred that "the scope of their partial

preemptive effect on the Medical Debt Reporting Act as it applies to veterans' medical debt is less obvious." *Id.* at 12. But because the parties had not briefed that partial preemption issue, the First Circuit remanded the matter to this Court to decide in the first instance. *Id.* Finally, because this Court had not addressed CDIA's argument that the Economic Abuse Debt Reporting Act is preempted by Section 1681t(b)(5)(c), the First Circuit remanded that issue as well. *Id.* at 13-14.

On remand, CDIA argued that § 1681c(a)(1-5) "regulates the reporting of all forms of adverse information on consumers," encompassing the consumer debt targeted by Maine statute. *See* Second Mot. for J. on the R. at 7-8 (ECF No. 65). But this Court rejected CDIA's argument and concluded instead that the subject matter regulated by § 1681c(a)(1-5) is "categories of information that are more than seven years stale." *Consumer Data Indus. Ass'n v. Frey*, 710 F. Supp. 3d 73, 79 (D. Me. 2024). Section 1681c(a)(1-5) thus does not preempt states from regulating the inclusion of information on consumer reports less than seven years old. *Id.* Accordingly, it bears no preemption effect on statutes like Maine's Medical Debt Restriction. *Id.*

This Court also rejected CDIA's argument that the Medical Debt Restriction was preempted by Section 1681c(a)(6), which regulates the inclusion on consumer reports of the names, addresses, and telephone numbers of medical providers. *Id.* at 80. The Court recognized that this "narrowly tailored provision" is "limited to reporting activity that reveals the nature of the services rendered": "[s]ince the Maine requirements do not trench on the same subject matter, namely medical confidentiality, they are not preempted by subsection (a)(6)." *Id.*

Next, it turned to §§ 1681c(a)(7) and (8), which prohibit reporting of a veteran's medical debt if it is less than one year old or has been fully paid or settled. *Id.* It noted that, in contrast, Maine's Medical Debt Restriction permitted reporting of medical debt after 180 days. *Id.* It thus concluded that "because section 1681c regulates the subject matter of the earliest timing of reports

related to veterans' medical debts, the Maine Medical Debt [Restriction] is partially preempted and . . . is ineffectual and unenforceable as applied to the medical debts of veterans." *Id.*

Finally, the Court rejected CDIA's assertion that Maine's Economic Abuse Provision is preempted by § 1681t(b)(5)(C) prohibition on state laws "with respect to the conduct required by," among other items, "identity theft." *Id.* at 81. Although the Court acknowledged that there may be some occasions where the Venn diagram of "identity theft" and "economic abuse" could overlap, it concluded that "[g]iven the language Congress used in the FCRA, state requirements and prohibitions should only be preempted when the matter is capable of classification as identity theft, and then only 'with respect to the conduct required' by the FCRA's identity theft reporting regulations." *Id.* (quoting 15 U.S.C. § 1681t(b)(5).

On February 8, 2024, CDIA appealed. (ECF 72). Maine did not cross-appeal or challenge this Court's conclusions regarding veterans' medical debts or identity theft. While the appeal was pending before the First Circuit, Maine's enacted it's Medical Debt Ban. On September 24, 2025, the First Circuit granted CDIA's request to remand the case "in light of recent material changes in the medical-debt provision of Maine law." (ECF 77). On July 16, 2026, this Court granted CDIA's request to file an Amended Complaint, adding as a co-plaintiff "The Thomas Agency,"[3] "subject to [CDIA's] representation that neither it nor . . . The Thomas Agency seeks to assert new claims relating to the Economic Abuse Provision." (ECF 95). CDIA and The Thomas Agency (collectively "Industry Plaintiffs") filed the Amended Complaint on July 30. (ECF 97).

[3] At this stage it is not entirely clear that handful of additional allegations regarding The Thomas Agency are enough to establish Article III standing for each claim it purports to assert. *See Wescott v. Stanfill*, 778 F. Supp. 3d 193, 196 (D. Me. 2025).

## Legal Standard

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief could be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (internal quotation marks omitted). As part of this examination, the Court accepts as true all well-pleaded factual allegations, drawing all reasonable inferences in the plaintiff's favor. *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009). A complaint's legal conclusions, however, "are not entitled to a presumption of truth." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 10 (1st Cir. 2011).

"[A] federal preemption ruling presents a pure question of law." *Medicaid & Medicare Advantage Prods. Ass'n. v. Emanuelli Hernández*, 58 F.4th 5, 11 (1st Cir. 2023) (quoting *United States v. R.I. Insurers' Insolvency Fund*, 80 F.3d 616, 619 (1st Cir. 1996)). In such cases, "[t]he burden to prove preemption is on the plaintiffs." *Id.* (quoting *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 21 (1st Cir. 2019)).

## Argument

### I. Under Supreme Court and First Circuit precedent, the strong medicine of federal preemption should be applied cautiously.

A. All preemption challenges—even express preemption provisions—must not be interpreted to preempt state law unless the Court determines it was the "clear and manifest purpose" of Congress to do so.

Consistent with bedrock federalist principles, the Supreme Court has long recognized a presumption against federal preemption of state law. *N.Y.S. Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995); *see also Rice v. Santa Fe Elevator Corp.*,

331 U.S. 218, 230 (1947). As the First Circuit has explained, "[p]reemption is strong medicine, not casually to be dispensed." *Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 18 (1st Cir. 2000). "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Rice*, 331 U.S. at 230). That presumption is strongest "in fields of traditional state regulation." *Travelers Ins.*, 514 U.S. at 655.

Consumer protection laws are the classic example. *See, e.g., Medtronic v. Lohr*, 518 U.S. 470, 475 (1996) ("[T]he States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."); *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 43 (1st Cir. 2005) (noting "consumer protection" is a "subject over which the states have traditionally exercised their police powers") (quoting *Greenwood Tr. Co. v. Massachusetts*, 971 F.2d 818, 828 (1st Cir. 1992)). Maine's Economic Abuse Provision and Medical Debt Ban therefore should only be called into question if Congress has conveyed a "clear and manifest" preemptive purpose to do so. *Rice*, 331 U.S. at 230; *see also Medtronic, Inc.*, 518 U.S. at 485; *Harshbarger*, 122 F.3d at 68.

Federal law may supersede state law in three different ways: 1) Congress can include language in the law that expressly preempts certain state laws; 2) the law can create a scheme of regulation that is so comprehensive that it essentially "occupies the field" and leaves no room for state regulation; or 3) the state law actually conflicts with federal law. *See, e.g., Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

"Express preemption occurs when Congress states in the text of legislation that it intends to preempt state legislation in the area." *EEOC v. Massachusetts*, 987 F.2d 64, 67-68 (1st Cir.

1993); *see also Grant's Dairy—Me.*, 232 F.3d at 15 ("Express preemption occurs only when a federal statute explicitly confirms Congress's intention to preempt state law and defines the extent of that preclusion."). The First Circuit traditionally applied the presumption against preemption in all express preemption cases:

> Two presumptions inform the process of determining the scope of an express preemption clause. First, the familiar assumption that preemption will not lie absent evidence of a clear and manifest congressional purpose must be applied not only when answering the threshold question of whether Congress intended *any* preemption to occur, but also when measuring the reach of an explicit preemption clause. Second, while the scope determination must be anchored in the text of the express preemption clause, congressional intent is not to be derived solely from that language but from context as well.

*Mass. Ass'n of Health Maint. Orgs. v. Ruthardt*, 194 F.3d 176, 179 (1st Cir. 1999) (emphasis in original). More recently, however, the First Circuit has joined several sister circuits in concluding that the presumption against preemption does not apply when analyzing express preemption statutes. *See Medicaid & Medicare Advantage Prods. Ass'n.*, 58 F.4th at 12 n.5; *but see Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018) (concluding that the presumption applies in express preemption cases where the subject matter falls under an area subject to the States' historic police powers). Nevertheless, even where a formal presumption is not compelled by federal common law, the First Circuit has reiterated that "federal law should not be interpreted to preempt state law 'unless that was the clear an manifest purpose of Congress.'" *Medicaid & Medicare Advantage Prods. Ass'n.*, 58 F.4th at 11.

B. <u>A formal "presumption against preemption" applies to Industry Plaintiffs' obstacle preemption challenge.</u>

The Supreme Court has stated that "in all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded

by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). And in cases where a plaintiff argues that a state statute "pose[s] and obstacle to its objectives," the formal "presumption against preemption" applies. *Id.* at 574-75. Moreover, the "case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Id.* at 575. Accordingly, in addition to the caution against casually dispensing the "strong medicine" of federal preemption which applies in all preemption challenges, *see Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001), any obstacle preemption challenge asserted by Industry Plaintiffs must also overcome the formal presumption against preemption.

**II. FCRA does not preempt Maine's Economic Abuse Provision.**

A. Challenges to the Economic Abuse Provision are foreclosed by prior decisions from the First Circuit and this Court as law of the case.

Given the prior rulings in this suit, nothing remains to be litigated regarding Plaintiffs' challenge to Maine's Economic Abuse Provision. When the First Circuit first reviewed CDIA's challenges four years ago, it held that the Economic Abuse Provision was "not preempted in [its] entirety by" sections 1681t(b)(1)(E) and 1681c. *CDIA*, 26 F.4th at 14; *see also CDIA*, 710 F. Supp. 3d at 78 (quoting same). It then remanded to this Court the question of whether the Economic Abuse Provision is "partially preempted" by those sections. *Id.*

Upon remand, Defendants argued that no aspect of the Economic Abuse Provision was subject to preemption. *See* Defs.' Cross Mot. for J. ("Cross Mot.") (ECF No. 66) at 8-13, 14-18. In turn, this Court concluded that there was no identifiable "viable facial challenge to the Maine reporting requirements" under 15 U.S.C. §§ 1681t(b)(1)(E) and 1681c. *CDIA*, 710 F. Supp. 3d. at 79. And regarding the preemption challenge asserted pursuant to § 1681t(b)(5)(C), this Court

concluded that it could "not read [the statute] as an expression of congressional intent to foreclose regulation of reporting activity associated with economic abuse as it is defined in Maine law." *Id. at* 81. Construing the federal statute in such a way would be "unreasonable." *Id.* Instead, preemption is only triggered "when the matter is capable of classification as identity theft, and then only 'with respect to the conduct required' by the FCRA's identity theft reporting regulations." *Id.* (quoting 15 U.S.C. § 1681t(b)(5).

There have been no changes to Maine's Economic Abuse Provision since this Court last rejected Industry Plaintiffs' preemption challenge. And as directed by this Court's July 16, 2026, docket Order, Industry Plaintiffs have asserted no "new claims relating to the Economic Abuse Provision." (ECF No. 95). Accordingly, law of the case from both the First Circuit and this Court doom all aspects of the Amended Complaint's Count I to the extent that Industry Plaintiffs assert that Maine's Economic Abuse Provision is facially preempted by FCRA. *See, e.g.*, *Lacy v. Gardino*, 791 F.2d. 980, 984 (1st Cir. 1986) ("The law of the case doctrine makes binding upon a court a ruling made by a court at the same or higher level during prior stages of the same litigation, unless, of course, the ruling has been reversed in the interim."). The same goes for their assertions of partial preemption, beyond such circumstances related to identity theft as explained by this Court's 2024 Memorandum of Decision and Order. *See CDIA*, 710 F. Supp. 3d at 81.

B. <u>Industry Plaintiffs' challenges to the Economic Abuse Provision would be foreclosed, even if this Court were to examine the issue anew.</u>

Even if this Court opted not to apply law of the case, but instead examined the question de novo, Industry Plaintiffs cannot prevail in their challenge to Maine's Economic Abuse provision for the reasons previously pressed by Defendants in their Cross Motion. *See* Cross Mot. (ECF 66) at 8-13, 14-18. Accordingly, if the Court determines that law of the case does not apply,

Defendants respectfully request that the Court permit them to re-adopt and re-assert their legal argumentation regarding preemption of the Economic Abuse Provision. *Id.*

For the reasons asserted by Maine Defendants—and previously adopted by this Court (ECF No. 70)—the Industry Plaintiffs' preemption claims asserted against Maine's unchanged Economic Abuse Provision should be dismissed.

**III. FCRA does not preempt Maine's Medical Debt Ban.**

A. Changes to Maine's Medical Debt Restriction do not alter this Court's prior legal analysis rejecting Industry Plaintiffs' preemption challenge.

As with Maine's Economic Abuse Provision, the First Circuit concluded that Maine's original Medical Debt Restriction was not subject to broad federal preemption. *CDIA*, 24 F.4th at 14. Instead, the First Circuit concluded that the Medical Debt Restriction was only "narrowly" preempted if—and to the extent—that it "impose[s] requirements or prohibitions with respect to the specific subject matters regulated under Section 1681c." *Id.* And, again, upon remand this Court concluded that 15 U.S.C. § 1681t(b)(1)(E)—which incorporates by reference 15 U.S.C. § 1681c—offered no "viable facial challenge" to the entirety of Maine's Medical Debt Restriction. *CDIA*, 710 F. Supp. 3d at 79.

However, because this Court determined that "medical debt of veterans" constitutes a specific "subject matter regulated under" 15 U.S.C. § 1681c, it concluded that the Medical Debt Restriction was "partially preempted" and therefore "ineffectual and unenforceable as applied to the medical debts of veterans."[4] *Id.* at 80. But aside from the discrete category of veterans' medical debt, the Court determined that CDIA raised no "additional concern over a conflict between" FCRA and the Medical Debt Restriction. *Id.*

[4] Maine unsuccessfully argued otherwise. *See* Cross Mot. at 13-14. But Defendants concede that the Court's legal analysis on this point is law of the case and do not seek to relitigate issues the Court has already resolved.

Strikingly, the Amended Complaint fails to offer any legal theory as to why an outright ban on medical debt reporting is preempted by FCRA where the First Circuit has already held that certain time-barred restrictions on medical reporting are not. Its silence only serves to underscore that nothing in the Medical Debt Ban changes this Court's prior FCRA preemption analysis. To the extent that CDIA argues that Maine's Medical Debt Ban violates a purported congressional intent to establish a uniform nationwide consumer reporting regime, *see, e.g.*, Am. Compl. ¶¶ 17, 117-18, that argument has already been soundly rejected by both the First Circuit and this Court. *See CDIA*, 26 F.4th at 9 ("We see no reason to presume that Congress intended, in providing some federal protection to consumers regarding the information contained in credit reports, to oust all opportunity for states to provide more protections, even if those protections would not otherwise be preempted as 'inconsistent' with the FCRA as under 15 U.S.C. § 1681t(a)."); *CDIA*, 710 F. Supp. 3d at 79 ("Because neither subsection reveals a congressional intention to preempt state reporting regulation insofar as the information in question is not more than seven years stale, I do not identify a viable facial challenge to the Maine reporting requirements.").

To the extent that the Amended Complaint seeks to substantively re-litigate preemption issues related to Maine's Medical Debt Ban that this Court's legal reasoning has already foreclosed, Defendants respectfully request that the Court allow them to adopt and assert their previous argumentation as to why Maine's regulations on medical debt reporting are not preempted by FCRA, whether they are less than 180 days old or not. *See* Cross Mot. at 9-14 (ECF 66). Defendants' explanation as to why the Medical Debt Restriction was not preempted by FCRA remains unaltered when applied to Maine's Medical Debt Ban. Outside of the context of veterans' medical debt, this Court has already decided the issue in Maine's favor. *See CDIA* 710 F. Supp. 3d at 79-80. Elimination of the 180-day timeframe does not undermine the Court's prior analysis.

B. Any new theories advanced in the Amended Complaint as to why Maine's Medical Debt Ban is preempted by FCRA are doomed by law of the case.

The only new preemption theory Industry Plaintiffs offer in the Amended Complaint is the assertion that Maine's Medical Debt Ban (and potentially the Economic Abuse Provision)[5] is subject to obstacle preemption. *See* Am. Compl. ¶¶ 17, 72, 88, 118. This theory is doubly flawed.

*First*, the Amended Complaint's four passing allusions to "obstacle preemption" are not grounded in differences between the new Medical Debt Ban and the previously litigated Medical Debt Restriction. *See id.* Likewise, no aspect of this Court's rejection of the Industry Plaintiffs' preemption arguments relied upon the Medical Debt Provision's temporary time-bar restrictions, as opposed to an outright reporting ban. *See CDIA*, 710 F. Supp. 3d at 79-80. Nor did the First Circuit rely upon the temporary nature of the original Medical Debt Provision in rejecting the Industry Plaintiffs' preemption argument. *See CDIA*, 26 F.4th at 9-13.

*Second*, Industry Plaintiffs' obstacle preemption theory cannot survive the scrutiny of prior decisions in this action from both this Court and the First Circuit. The First Circuit has already concluded that "if as CDIA claims, Congress intended to preempt all state laws relating to information contained in consumer reports, it could have easily so stated." *CDIA*, 26 F. 4th at 8. Further, "Congress knows how to preempt states from regulating entire subject areas. . . . Yet, that is not what happened with the FCRA." *Id.*

But the First Circuit did not stop there. In response to Industry Plaintiffs' argument "that legislative history reflects that Congress intended to expand the preemptive scope of the FCRA by

[5] Under Count I, which challenges both the Medical Debt Ban and the Economic Abuse Provision, Industry Plaintiffs assert that Maine's "prohibitions stand as an obstacle to accomplishing Congress's objectives in passing FCRA[.]" Am. Compl. ¶ 118. To the extent that this asserts a new obstacle preemption claim against Maine's Economic Abuse Provision, such a claim is barred by this Court's July 16, 2026, Order permitting Industry Plaintiffs to file an Amended Complaint, "subject to Plaintiff's representation that neither it nor proposed Plaintiff The Thomas Agency seeks to assert new claims relating to the Economic Abuse Provision."

establishing a uniform national standard related to information contained in credit reporting with which states could not interfere," the court found "no reason to presume that Congress intended, in providing some federal protection to consumers regarding the information contained in credit reports, to oust all opportunity for states to provide more protections." *Id.* at 9; *see also id.* ("What is more, if Congress intended to impose that degree of uniformity, it could have accomplished this objective by prohibiting all state regulation of content of consumer reports. But Congress did not write the statute that way." (internal quotation marks omitted)).

As the First Circuit has acknowledged, "obstacle preemption" is simply an "offshoot of conflict preemption" where "'a state law confers rights or imposes restrictions that conflict with the federal law.'" *See Me. Forest Prods. Council v. Cormier*, 51 F. 4th 1, 6 (1st Cir. 2022). Hence, this Court's careful analysis on remand of CDIA's preemption arguments provides further support for rejecting the Amended Complaint's assertion of obstacle preemption. This Court already concluded that Maine's limits on reporting medical debt "do not trench on the same subject matter" as FCRA, except in the narrow area of its application to the medical debt of veterans. *CDIA*, 710 F. Supp. 3d at 80; *see also id.* (noting that the Court's review did "not reveal any additional concern over a conflict" between FCRA and Maine's Medical Debt Reporting Act). Removing Maine's prior 180-day restriction on medical debt reporting does nothing to create a conflict between Maine statute and FCRA when this Court has already determined that none exists otherwise.[6]

[6] The Amended Complaint points to a decision from the Eastern District of Texas, where that court commented that "any state law purporting to prohibit a [consumer reporting agency] from furnishing a credit report with coded medical information would be inconsistent with FCRA and therefore preempted." Am. Compl. ¶ 90 (quoting *Cornerstone Credit Union League v. Consumer Fin. Prot. Bureau*, 791 F. Supp. 3d 720, 741 (E.D. Tex. 2025)). To the extent that such dicta from an out-of-circuit trial court conflicts with prior decisions of this Court and the First Circuit, it should be discarded. *See United States v. Barnard*, 704 F. Supp. 3d 259, 266-67 (D. Me. 2023) ("Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority.") (quoting *Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004)).

Accordingly, allowing Industry Plaintiffs to proceed to discovery on a theory of obstacle preemption would be inappropriate even if this Court were faced with the question in the first instance, for the reasons articulated in this Court's 2024 Memorandum of Decision and Order. Specifically, allowing Count I to proceed to discovery under these circumstances would undermine seven years of fully litigated decisions decided by this Court and the First Circuit. *See Lacy*, 791 F.2d. at 984. If any doubt lingers, our federalist Constitution's strong presumption against the preemption of the States' police powers discussed above in Part I breaks all tie in favor of Maine.

**CONCLUSION**

Defendants respectfully request that this Court dismiss Count I, to the extent that doing so does not conflict with law of the case regarding FCRA's identity theft reporting provisions and the reporting of veterans' medical debt.

DATED: September 3, 2026

Respectfully submitted,

AARON M. FREY
Attorney General

*/s/ Paul E. Suitter*
Paul E. Suitter
Assistant Attorney General
paul.suitter@maine.gov
Six State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8800

*Counsel for Defendants*